Father Vincent RIGDON,
et al., Plaintiffs,

v.

Dr. William J. PERRY,
et al., Defendants.

Civil Action No. 96–02092.

United States District Court,
District of Columbia.

April 7, 1997.

Kevin J. Hasson, Becket Fund for Religious Liberty, Washington, DC, for plaintiffs.

Kimberly Nickelson Tarver, U.S. Attorney's Office, Washington, DC, for defendants.

## MEMORANDUM OPINION OF THE HONORABLE STANLEY SPORKIN UNITED STATES DISTRICT JUDGE

SPORKIN, District Judge.

## I.

## INTRODUCTION

The plaintiffs filed a complaint in the above-captioned case on September 10, 1996. The case originally was assigned to the Late Honorable Charles R. Richey of this Court, but was transferred to the undersigned when he became incapacitated. Judge Richey held a status conference pursuant to Rule 16 of the Federal Rules of Civil Procedure on September 20, 1996 at which time he set dates for the completion of discovery and the filing of dispositive motions. Before the Court are the parties' cross-motions for summary judgment. Also before the Court are the plaintiffs' motion for a preliminary injunction filed on March 25, 1997 and the defendants' opposition thereto.

The plaintiffs have brought a challenge under the Religious Freedom Restoration Act and the free exercise and free speech clauses of the First Amendment to the defendants' interpretation of military regulations and a federal anti-lobbying statute that purportedly prohibit military chaplains from encouraging their congregants to contact Congress on pending legislation, in particular on legislation that would outlaw an abortion procedure commonly known as "partial birth" abortion. For the reasons discussed below, the Court shall GRANT the plaintiffs' motion for preliminary injunction and motion for summary judgment.

## II.

## UNDISPUTED FACTS

### A. Background

This lawsuit was precipitated by events surrounding the so-called "Project Life Postcard Campaign," in which the Catholic Church in the United States sought to speak with a unified voice urging Congress to override the President's veto of HR 1833, also known as the Partial Birth Abortion Ban Act. The campaign began on June 29, 1996 and was set to last "at least until the Congress votes on whether to override the President's veto." *Id.* at ¶ 12. The Campaign consisted of Catholic priests throughout the country preaching to their parishioners against an abortion procedure known medically as intact dilation and evacuation, and colloquially as "partial birth abortion". Priests were encouraged to "ask their parishioners to sign postcards urging their U.S. Senators and Representatives to vote to override the President's veto." *Id.* at ¶ 13.

On or about May 29, 1996, the Archdiocese for the Military Services sent a letter informing Catholic chaplains in the U.S. military of the Post Card Campaign. Among other things, the letter stated, "You might well consider asking your parishioners to be a part of this joint effort. I am sending you information and addresses of the appropriate legislators as well as a copy of the project postcard that you could copy and give to your parishioners to enlist their cooperation in these efforts on behalf of human life."

Apparently in response to a request by the Office of the Chief Chaplain, on June 5, 1996, an Air Force Judge Advocate General ("JAG") issued an opinion letter regarding participation in the Post Card Campaign by Air Force chaplains. The JAG stated, "We believe that the applicable directives prohibit you from participating in this campaign or encouraging other Air Force chaplains or members to participate in it." The JAG's stated reasons were three-fold. First, he cited a Department of Defense Directive and an Air Force regulation (DoD 1344.10, ¶ D.1.B(1); AFI 51–902, ¶ 3.1) prohibiting a member on active duty from using "his official authority or influence for soliciting votes for a particular issue." Second, the memorandum cited an Air Force regulation (AFI 51–902, ¶ 3.3) that prohibits a member on active duty from participating in partisan political activity, defined to include "support-

ing issues identified with national political parties or ancillary organizations." Third, the memorandum cited a DoD Instruction (5500.7–A § 6–100) which provides that an "Air Force member may not participate in political activities while on duty; while wearing a uniform, badge insignia or other similar item that identifies his position; or while in any building occupied in the discharge of official duties by an individual employed by the United States Government." [1]

On June 21, 1996, a memorandum from Navy Deputy Chief of Chaplains A.B. Holderby, Jr. to staff chaplains stated that members on active duty may not use "their official position to solicit votes for a particular candidate or issue." It further stated that "[a]nti-lobbying laws prohibit government employees from using appropriated funds to directly or indirectly influence congressional action on pending legislation." Therefore, the memorandum instructed, Navy personnel may not "officially participate or urge others to participate in" the Post Card Campaign. The memorandum specifically instructed that "[n]o one acting in an official capacity may distribute post-cards or use government resources such as congregation newsletters to publicize the campaign." However, these restrictions would not preclude chaplains from "discuss[ing] the morality of current issues in their sermons or religious teachings pursuant to their religion." Additionally, members were not restricted from communicating with members of Congress in their "personal or private capacities."

On June 24, 1996, the United States Army Headquarters sent a message to commanders of the Major Army Commands that was almost identical to the Holderby memorandum. On the same day, the Army's Office of the Chief of Public Affairs issued a similar memorandum; this memorandum explicitly

invoked the Anti–Lobbying Act, 18 U.S.C. § 1913. The Anti–Lobbying Act provides that, absent express congressional authorization, no part of any money appropriated by any enactment of Congress, may be "used directly or indirectly to pay for any personal service, advertisement, . . ., letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress . . ." 18 U.S.C.A. § 1913 (West 1984). Anyone who violates or attempts to violate the Act "shall be fined . . . or imprisoned not more than one year or both; and after notice and hearing by the superior officer vested with the power of removing him, shall be removed from office or employment." *Id.*

## B. The Plaintiffs

Plaintiff Father Rigdon holds the rank of Lieutenant Colonel in the Air Force. He is a Roman Catholic chaplain in the Ready Reserve who provides Catholic Coverage at Andrews Air Force Base, which means that he is available to fill in for the regular chaplain on short notice to say mass, hear confession, or provide counseling. He provides such coverage at least twenty days per year.[2] Upon receiving the May 29 letter regarding the "Project Life Postcard Campaign" from the Military Archdiocese, Father Rigdon "considered [it] to be a directive from [his] bishop concerning the content of [his] preaching," a directive that his conscience as well as Canon 768 of the Catholic Code of Canon Law required him to follow. According to Father Rigdon's declaration submitted on November 8, 1996, the "Air Force memorandum issued in June [3] created a conflict of

---

1. On June 7, 1996, a memorandum regarding the Post Card Campaign was disseminated to all senior chaplains; it quoted extensively from the Judge Advocate General's June 5 letter. The parties dispute the source of this June 7 memorandum. The plaintiffs claim that it was issued by Air Force Headquarters, whereas the defendants claim that it was issued by the Air Force Office of the Chief Chaplain. The dispute over the source of the memorandum does not appear to be a dispute over a material fact, because it is undisputed that the content of this and like mem-

oranda were communicated to the plaintiff military chaplains.

2. There is no evidence in the record indicating whether Father Rigdon is compensated for these services.

3. The Court presumes that Father Rigdon is referring to the June 7 memo quoting the June 5 memo from the Judge Advocate General.

**154**

conscience between the demands of [his] faith and [his] desire to conform to military directives."

The military directives prevailed in Father Rigdon's mind. While on active duty during the last three days of the Post Card campaign in September,[4] Father Rigdon did not feel "free ... to preach[ ] in favor of overriding the President's veto and distribute[ ] postcards." Further, he interpreted and continues to interpret the "encourage other[s] to participate" language contained in the Judge Advocate General opinion as prohibiting him from encouraging others to write to Congress "in all contexts, including private counseling of Air Force members as well as urging them to write their members of Congress in a homily." He further interprets the opinion as barring him from urging Air Force personnel from contacting Congress about any legislative issue, not just the Partial Birth Abortion Bar Act. Consequently, Father Rigdon was and continues to be "wary of addressing moral issues that intersect with legislation in homilies or counseling for fear of disciplinary action" against him. Father Rigdon notes that the Project Life Postcard Campaign was not the first such campaign sponsored by the Roman Catholic Church and "surely will not be the last."

In his declaration submitted on March 25, 1997 in support of his motion for preliminary injunction, Father Rigdon states that the Partial Birth Abortion Ban Act, which failed to become law in the 104th Congress, has been reintroduced in the 105th Congress and has already passed the House of Representatives. He further notes,

"If called upon to say Mass at Andrews Air Force Base, I would like to encourage my congregation to call or write their Senators in support of this bill. Because of the Memoranda issued by the Air Force last June, and the position articulated by the Defendants since then, I am afraid to speak to my congregation about the Partial

Birth Abortion Ban Act for fear of prosecution or other action against me."

*Second Declaration of Father Rigdon* at ¶ 3. The defendants argue that since Father Rigdon is a Reservist, "it is only speculative whether [he] ... will be called upon to say Mass at Andrews Air Force Base during the pendency of the proposed legislation." *Defendants' Memorandum in Opposition to Motion for Preliminary Injunction* at 5.

Plaintiff Rabbi Kaye is an active duty Air Force chaplain stationed at Offutt Air Force Base in Nebraska and currently holds the rank of Captain. According to Rabbi Kaye, "it is impossible, indeed incoherent, to separate moral teachings from Judaism. And when a law is immoral [he] believe[s] that as a Rabbi [he] must not remain silent." Thus, Rabbi Kaye believes that he must be able to speak out against or in favor of legislation concerning what he considers to be immoral practices, including "partial birth" abortion, euthanasia, and "various forms of sexual immorality."

In his declaration submitted on November 8, 1996, Rabbi Kaye states that he feels potentially threatened with punishment if he speaks out against immoral laws. However, he does not say that he ever desired in the past or in the future to encourage his congregants to write to Congress.

On March 26, 1997, Rabbi Kaye submitted a second declaration in light of the newly-introduced bill on partial birth abortion. This time, Rabbi Kaye states that "partial birth" abortion is "infanticide," "an abomination before God and violate's God's law." He further complains that

"as a Rabbi I must tell my Congregation that this abomination must not be allowed to continue in a society that calls itself just. I believe that I must tell my Congregation that as Jews they have a duty to oppose injustice. I wish to tell my congregation that the Partial Birth Abortion Ban Act

---

**4.** The defendants have submitted evidence that Father Rigdon was not on active duty in June 1996. They have not submitted any evidence showing that Father Rigdon was not on active

duty in September 1996 when the alleged violation of his free speech and free exercise rights occurred.

presents them with an opportunity to oppose one of the greatest injustices that exists in the United States. Under current Air Force policy, I cannot say this to my Congregation."

*Second Kaye Declaration* at ¶ 4.[5]

There is no dispute that the military continues to prohibit military chaplains from encouraging their military congregants to contact Congress in favor of the Partial Birth Abortion Ban Act. There also is no dispute that the existence of the military chaplaincy is critical to fulfilling the free exercise rights of service men and women and their families, and that service members are forced to rely exclusively on chaplains when stationed in parts of the country in regions where clergy of their faith are not available, in countries overseas where religious freedom is not recognized or their religion not prevalent, and when deployed in conflicts. The defendants merely contend that the anti-lobbying restrictions on preaching and counseling by military chaplains (which also apply to all other service members) advance the compelling interests of a politically disinterested military establishment, the good order and discipline of service members essential to military readiness and national defense, and the protection of the political rights of individual service members.

# III.

# DISCUSSION

## A. The Plaintiffs' Claims Are Justiciable.

In their briefs filed in November 1996, the defendants argued that the plaintiffs lack standing and their lawsuit was both moot and unripe, because the 104th Congress adjourned without passage of the Partial Birth Abortion Ban Act and, as a consequence, there was no longer legislation about which the chaplains wanted to encourage their congregants to contact Congress. Intervening events, however, have substantially undermined the thrust of the defendants' argument about nonjusticiability. A bill to amend the United States Code to ban partial birth abortions (H.R.1122) passed the House of Representatives on March 20, 1997. *See* 143 Cong. Rec. H1202–05 (March 20, 1997). A similar Senate bill (S.6) was introduced on January 21, 1997. *See* 143 Cong. Rec. § 158–02, § 158 (Jan. 21, 1997). While the plaintiffs do not allege that there is currently an ongoing Post Card Campaign, they have proffered facts that support a finding of justiciability, specifically with regard to plaintiff Rabbi Kaye.

The defendants contend that Rabbi Kaye's desire to tell his congregants that " 'the procedure known as Partial Birth Abortion' is an 'abomination before God and violate's God's law' ... does not implicate the statute and

---

**5.** There are several other plaintiffs in this lawsuit. Plaintiff Muslim American Military Association ("MAMA") consists of service members in all the branches of the Armed Services. Ghayth Nur Kashif is Imam of the MAMA. He claims that the Quran requires a Muslim to give alms to the poor. According to him, if Congress "is considering welfare reform, as it did this [past] summer, a Muslim Chaplain should be free to tell his Congregants how this command of the Quran should affect their view of welfare reform, and he should be free to tell them if they have an obligation to contact their Congressman." Other than this hypothetical situation, the Imam does not indicate that he or any other Muslim chaplain in the military ever desired to tell his congregants to urge Congress to vote in favor of the Partial Birth Abortion Ban Act, but did not do so due to the military regulations at issue herein. Because at least one of the plaintiffs' claims are justiciable (Rabbi Kaye's), the Court need not address the justiciability of the MAMA's claims.

The two other plaintiffs are Liam Downes, a Third Class Petty Officer in the Navy, and his

wife, Karen, both of whom are Roman Catholics and who are parishioners of the Naval Academy Chapel. They assert that the defendants' actions interfere with their right to receive information pertaining to moral issues during religious services and individual counseling from their priest. On November 8, 1996, the plaintiffs advised the Court that Mr. Downes was recently discharged from the Navy. Consequently, they have moved to add U.S. Army Chief Warrant Officer John M. Johnston and his wife, Cheryl M. Johnston, to the complaint in place of the Downes. Mr. Johnston is a Catholic, and his wife is a Protestant, and both attend worship services of their respective faiths at Fort Dix. The defendants oppose the addition of the Johnstons to this case solely on the ground that the plaintiffs' claims allegedly are not justiciable. As noted above, the Court need not address the justiciability of these plaintiffs' claims, because Rabbi Kaye's claims are justiciable. Therefore, the plaintiffs' motion to amend shall be denied as moot.

regulation at issue in this action ..." because he is free to "speak out on the issue of abortion or a particular abortion procedure." *Defendants' Opp'n to Prelim. Inj.* at 6 (quoting Rabbi Kaye's Second Declaration). As noted above, however, Rabbi Kaye wishes to convey more than his belief in the immorality of an abortion procedure. He wishes to tell his Jewish congregants that they have "a duty to oppose injustice" and that "the Partial Birth Abortion Ban Act presents them with an opportunity to oppose one of the greatest injustices that exists in the United States." Because Rabbi Kaye explicitly references the pending anti-abortion legislation, it would be reasonable for his congregants to interpret these words as a call to urge Congress to pass the Partial Birth Abortion Ban Act.

The defendants' opposition brief is utterly silent with respect to the permissibility of these particular words. Similarly, at oral argument, when the Court asked defendants' counsel about whether these particular words would violate the defendants' anti-lobbying proscription, counsel failed to provide a direct answer, merely stating that Rabbi Kaye generally is precluded from urging his congregants to lobby on the legislation. Accordingly, the Court finds that while Rabbi Kaye's declaration does not explicitly contain the words "I wish to tell my congregants to tell Congress to vote for the Partial Birth Abortion Ban Act," the defendants have not disavowed an intention to interpret the words in his declaration as violative of their speech restriction. Especially because the defendants have not disavowed an intention to impose discipline should Rabbi Kaye speak these words which he believes to be mandated by his Jewish faith, the Court must be vigilant to avoid an unduly narrow interpretation of his contemplated speech.

■ Thus, Rabbi Kaye's claims are not moot, because there is an "actual, ongoing controvers[y]" over the application of a military directive to his contemplated speech. *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988) (citations omitted). His claims also are ripe, because the controversy is imminent and concrete—Rabbi Kaye wants to utter his contemplated

speech now. *Cf. Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (holding that the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements"). Finally, Rabbi Kaye has standing because he has alleged (1) a concrete, particular, and imminent "invasion of a legally-protected interest"—his First Amendment and statutory rights to utter certain religious speech; (2) "a causal connection between the injury and conduct complained of"—Rabbi Kaye is prevented from uttering certain religious speech because of the defendants' proscription; and (3) it is "likely" that this injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992) (citations omitted).

Because Rabbi Kaye's claims are justiciable, the Court need not decide the justiciability of the other plaintiffs' claims. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 402 n. 22, 102 S.Ct. 3141, 3156 n. 22, 73 L.Ed.2d 835 (1982); *accord State of Kansas v. United States,* 797 F.Supp. 1042, 1046 (D.D.C.1992) (Pratt, J.), *aff'd,* 16 F.3d 436 (D.C.Cir.), *cert. denied,* 513 U.S. 945, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994).

**B. The Evidence Does Not Support the Defendants' Contention that DoD Directive 1344.10 Precludes Military Chaplains from Encouraging Their Congregants to Contact Congress on Pending Legislation.**

Prior to oral argument, the defendants contended that the following law and military directives prohibit military chaplains from urging their military congregants to communicate with Congress about pending legislation: (1) the Anti–Lobbying Act, 18 U.S.C. § 1913, prohibiting the use of appropriated funds "to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress"; (2) § 8001 of the Defense Appropriations Act for Fiscal Year 1996, prohibiting the use of appropriated funds for "publicity or propaganda purposes not authorized

by Congress;" and (3) Department of Defense ("DoD") Directive 1344.10, entitled *Political Activities of Members of the Armed Forces on Active Duty* (June 15, 1990), prohibiting an active duty member of the Armed Forces from using "his or her official authority or influence for . . . soliciting votes for a particular candidate or issue."

The defendants presented no argument in their briefs or at oral argument regarding the relevance of the Defense Appropriations Act. Further, at oral argument, defendants' counsel conceded that the Anti–Lobbying Act is not relevant to the facts of this case. The Act applies only to the expenditure of appropriated funds, and there is no evidence that the plaintiffs intend to use appropriated funds in their ecumenical activities. Accordingly, the defendants rely solely on DoD Directive 1344.10 to justify the restraints they now seek to impose on the plaintiffs.

■ DoD Directive 1344.10, entitled *Political Activities of Members of the Armed Forces on Active Duty* (June 15, 1990), regulates the political activities of active duty members of the Armed Forces. *See Defendants' Exhibit 2.* The Directive provides that a member may "express his or her personal opinion on political candidates and issues, but not as a representative of the Armed Forces." *Id.* at 1. The Directive precludes an active duty member of the Armed Forces from using "his or her official authority or influence for . . . soliciting votes for a particular candidate or issue . . . " *Id.* at 2. *See also* 18 U.S.C. § 609 (prohibiting the use of "military authority to influence the vote of a member of the Armed Forces"). The defendants have interpreted this Directive to prohibit active duty members of the Armed Forces, including chaplains, from "lobbying Congress or influencing others to lobby Congress." *Defendants' Opposition* at 8.

Initially, it does not appear that this Directive applies to the speech contemplated by Father Rigdon and Rabbi Kaye. It is reasonably clear that if they were to urge their congregants to vote for Congressmen or Congresswomen with anti-abortionist views, that they would be soliciting votes for particular candidates in contravention of the Directive. The same is true if they were to encourage their congregants to vote in favor of a state ballot initiative imposing a parental consent requirement on minors seeking abortions; they would be directly soliciting the votes of their congregants for a particular issue.

The factual predicate of this case, however, is at least one degree removed from these hypothetical, direct-voter solicitations. Here, Father Rigdon and Rabbi Kaye do not intend to influence the votes of their congregants (e.g., "Vote for that anti-abortion Congresswoman"), but to encourage their congregants to contact members of Congress who, in turn, could vote in favor of a piece of anti-abortion legislation. Thus, the chaplains' contemplated solicitation is indirect—encouraging congregants to encourage members of Congress to vote a certain way. The defendants have failed to explain how Directive 1344.10 is intended to prohibit such indirect solicitations for votes.

Moreover, Directive 1344.10 prohibits the misuse only of "official" authority or influence to solicit votes, not religious or spiritual influence. The plaintiffs argue that since a chaplain's legal status in the military is "rank without command" (*see* 10 U.S.C. §§ 3581, 8581 (West 1959)), military chaplains cannot give orders and have no official authority to misuse. For instance, while Father Rigdon acknowledges that he has "certain supervisory and administrative functions in the course of [his] duties, such as having clerical workers assisting [him] in the chaplain office," he maintains that if he had difficulty with any personnel assigned to him, he "would have to go to their commanding officer or First Sergeant for assistance, and could not issue any order to them . . . nor initiate any disciplinary action." *Rigdon Dec.* at ¶ 9.

While conceding that military chaplains have "rank without command," the defendants counter that military chaplains do have "official" authority, because they "are commissioned officers with all rights, privileges, responsibilities, and restrictions that attend a military commission, including the authority to issue lawful orders." In support of their assertion, the defendants cite the statutory provisions governing (1) the appointment of officers above the rank of colonel in the

158

Army, Air Force and Marines and above the rank of captain in the Navy; (2) the punishment of a person who behaves with disrespect toward his superior commissioned officer; (3) the punishment of a person who commits a violent act against a superior commissioned officer or who willfully disobeys a lawful command of his superior commissioned officer; and (4) the punishment of a person who violates any lawful general order or regulation or who is derelict in his duties. *See* 10 U.S.C. §§ 531, 889, 890, 892 (West 1983).

The defendants have failed to show how the above-cited statutory provisions vest military chaplains with the authority to issue orders. The appointment provision (10 U.S.C. § 531) is irrelevant. At most, it describes how military chaplains join the Armed Forces. The other three provisions (10 U.S.C. §§ 889, 890 and 892) merely provide for punishment when someone in the Armed Forces disobeys the command of a "superior commissioned officer." The defendants' reliance on these provisions, however, merely begs the question; these statutes in no way state that a military chaplain is a "superior commissioned officer" who can give orders on pain of punishment.

In their reply brief, the defendants point out that the term "superior commissioned officer" is defined to mean a "commissioned officer superior in rank *or* command." 10 U.S.C. § 801(5) (emphasis added). Thus, at least under this definition, a military chaplain could be a superior commissioned officer because he has rank. The defendants infer from this definition that chaplains can give orders subject to pain of punishment.

The defendants's inference rests upon certain language in the Manual for Courts–Martial. Punitive Article 89 of the Manual, captioned *Disrespect toward a superior commissioned officer*, provides that "[a]ny person ... who behaves with disrespect toward his superior commissioned officer shall be punished as a court-martial may direct." *Manual for Courts–Martial* at Part IV–17, ¶ 13a (1995). The *Manual* explains that if "the accused and the victim are in different armed forces, the victim is a 'superior commissioned officer' of the accused when the

victim is a commissioned officer and superior in the chain of command over the accused or when the victim, *not a medical officer or a chaplain*, is senior in grade to the accused and both are detained by a hostile entity so that recourse to the normal chain of command is prevented." *Id.* at Part IV–18, ¶ 13c.(1)(b) (emphasis added). The defendants assert that because chaplains are *not* "superior commissioned officers" when detained by a hostile entity along with someone from a different armed force, it follows that they "are 'superior commissioned officers' under other circumstances, and may issue orders." *See Defendants Reply Memorandum* at 8–9.

The defendants' argument is logically flawed. The *Manual* explicitly defines a victim of disrespect to be a "superior commissioned officer" when (1) the victim is a commissioned officer *and* superior in the chain of command over the accused *or* (2) the victim is not a medical officer or a chaplain but is senior in grade to the accused and both are detained by a hostile entity. Chaplains do not qualify under definition (1), because they cannot be superior in the chain of command; they have rank without command. Chaplains are specifically excluded from definition (2). Thus, the example cited by the defendants explicitly provides that chaplains are *not* included within the definition of "superior commissioned officers." The defendants ask this Court to draw the wholly unsupported inference that because chaplains are not "superior commissioned officers" in one context, that they are in other contexts.

The Court is not prepared to take such a leap in logic, especially because another example from the same section of the *Manual* also excludes chaplains from the definition of "superior commissioned officer." Paragraph 13c.(1)(a) states, "If the accused and the victim are in the same armed force, the victim is a 'superior commissioned officer' of the accused when either superior in rank or command to the accused; however, the victim is not a 'superior commissioned officer' of the accused if the victim is inferior in command, even though superior in rank." *Id.* at Part IV–18, ¶ 13c.1(a). Although it is possible for a chaplain to have greater rank than an

accused, he is always "inferior in command" because he has rank *without command.* Thus, a chaplain is not a "superior commissioned officer" under Article 89 and the other Punitive Articles in the *Manual* that incorporate the definition set forth in Article 89. The defendants have pointed to nothing in the record to dispute the plaintiffs' contention that military chaplains lack the authority to issue military orders.

The plaintiffs further point out that a chaplain does not speak with "official" authority when he speaks from the pulpit or in counseling or confession—the speech that is at issue in this litigation. The defendants counter in a circular fashion, arguing that military chaplains' primary military duties are performance of religious functions: "Thus, when chaplains perform these religious functions they are acting in their official capacity as a military officer, even if they are acting in a religious capacity at the same time." *Defendants' Opposition* at 9. In other words, according to the defendants, every word a military chaplain utters from the pulpit or in private counseling with service members constitutes an "official" act taken under "the color of military authority."

 The defendants inappropriately equate a military chaplains' official conduct with his religious activities, a distinction expressly recognized by military law. *See, e.g., Plaintiffs' Exhibit 23, Chaplain Activities in the United States Army, Army Regulation* 165–1, § 4–4a.(1) *(August 31, 1989 )* ("Army Chaplains have dual roles as religious leaders and staff officers."). While military chaplains may be employed by the military to perform religious duties, it does not follow that every word they utter bears the imprimatur of official military authority; if anything, the content of their services and coun-

seling bears the imprimatur of the religious ministries to which they belong. *See id.* § 4–5e.(1) ("Chaplains perform their duties as clergy representing specific religious denominations, and are accountable in their ministries to those groups regarding rites, sacraments, and services.").[6]

Indeed, the Military Rules of Evidence, in recognizing an evidentiary privilege for communications to clergy, state that a communication is confidential if made to a clergyman "in the clergyman's capacity *as a spiritual adviser.*" MILITARY R. EVID. 503(b)(2) (emphasis added); *accord Plaintiff's Exh. 23, § 4–5h.(1).* Military chaplains, therefore, can have communications with their congregants solely in a religious capacity, regardless of the fact that they have an official status as members of the military.

Similarly, military regulations governing the wearing of religious apparel implicitly acknowledge the distinction between a chaplain's official capacity as a representative of the military and his or her religious capacity. A Department of Defense Directive permits the wearing of visible items of religious apparel while in uniform so long as their appearance is "discreet" and "tidy," the apparel does "not replace or interfere with the proper wearing of any authorized article on the uniform," and the apparel is "not temporarily or permanently affixed or appended to any authorized article of the uniform." *Plaintiffs' Exhibit 21, Dep't of Directive 1300.17 (February 3, 1988)* at p. 2. Notwithstanding these limitations, "chaplains may wear any required religious apparel or accouterments with the uniform while conducting worship services and during the performance of rites and rituals distinct to their faith groups." *Id.* at 3.[7] Such regulations contemplate that

---

6. *See also id. 5 4–4a.(2)* ("The chaplain is a fully qualified member of the clergy of a religious denomination or faith group. Endorsement by the candidate's denomination or religious body is a requirement for service as a chaplain."); *Plaintiffs' Exhibit 26, SECNAV Instruction 1730.7A, Enclosure (1)* at p. 1 (September 2, 1993) ("Chaplains shall be professionally qualified clergy, certified and endorsed by their ecclesiastical endorsing agency ... Navy chaplains shall maintain their endorsement as an essential element of their professional qualification.").

7. *See also Plaintiff's Exh. 23, § 4–5b.(1)* ("When conducting religious services, a chaplain will wear the military uniform, vestments, or other appropriate clerical attire established by church law or denominational practice. In addition, the chaplain's scarf, stole, or tallit may be worn with the uniform, vestments, or other appropriate attire when conducting services."); *Plaintiffs' Exhibit 25, Air Force Instruction 52–101, ¶ 1.4 (January 28, 1994)* (permitting chaplains to "[w]ear the prescribed Air Force uniform or worship

chaplains act as representatives of their religions when conducting services or performing rituals, and, therefore, there is no military need for them to adhere to the uniform dress requirements at these times.

■ In sum, when chaplains are conducting worship, when they are surrounded by all the accouterments of religion, they are acting in their religious capacity, not as representatives of the military or, as defendants' counsel suggested at oral argument, "under the color of military authority." *Compare Geller v. Secretary of Defense*, 423 F.Supp. 16 (D.D.C.1976) (Robinson, J.) (holding that a Jewish chaplain in the Air Force should be permitted to wear a beard in accordance with Jewish tradition because he "was employed specifically by the military to serve in a religious capacity") *with Banks v. Garrett*, 901 F.2d 1084, 1088 (Fed.Cir.) (affirming finding that Navy reservist had acted in his official capacity when he sent a letter to Congress on official Navy letterhead, wrote his letter as Commander of the squadron, and signed the letter as Commander), *cert. denied*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).[8]

Still, the defendants maintain that a service member might "feel constrained to adhere to what may be perceived as an 'order' from ... a chaplain[ ] to support, endorse, or follow, any particular political message." *Defendants' Summary Judgment Memorandum* at 25. The defendants, however, have submitted no evidence in support of this speculative assertion. Indeed, that parishioners might interpret religious sermonizing as a military order defies common sense. As the plaintiffs persuasively counter:

"If a chaplain were to say to a congregant who had confessed to having a bitter argument with his wife, 'Go and forgive her, and say ten Hail Mary's,' surely this could not by any stretch of the imagination be

considered the issuance of a military order, the disobedience of which opens the service member to prosecution under the Uniform Code of Military Justice ... If what a chaplain tells his congregants to do or believe while preaching is an order, then for years orders have been being [sic] issued from all the branches of the military for service members to believe in the resurrection of Jesus, to believe that the Torah was written by Moses who was inspired by God, that Moslem soldiers must pray daily, and that Catholic service members must go to Mass every week."

*Plaintiffs' Reply* at 4.

The defendants have failed to show how DoD Directive 1344.10 prohibits military chaplains from urging parishioners to contact Congress in support of the Partial Birth Abortion Ban Act. But assuming *arguendo* that it does, as discussed below, such a prohibition violates the plaintiffs' rights under the Religious Freedom Restoration Act and the First Amendment.

## C. The Plaintiffs Are Entitled To Redress under the Religious Freedom Restoration Act.

The Religious Freedom Restoration Act ("RFRA") provides:

"Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability ... Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest."

---

apparel consistent with [their] faith group tradition when conducting religious services").

8. The words that a chaplain utters during the course of religious worship no more bear the official imprimatur of the military than the magazines, alcohol and tobacco sold by military exchanges. *See General Media Communications, Inc. v. Perry*, 952 F.Supp. 1072, 1080 (S.D.N.Y. 1997) (Scheindlin, J.) (rejecting as "unreason-

able" the government's argument that the sale and rental of magazines in military exchanges "might be interpreted as an official endorsement of the material published therein" because "[m]ilitary exchanges sell those produces that are popularly demanded by military personnel, even products that may be harmful to those who buy them").

42 U.S.C. § 2000bb–1(a), (b) (West 1994). The term "exercise of religion" means "the exercise of religion under the First Amendment of the Constitution." *Id.* § 2000bb–2(4).

### 1. The Anti–Lobbying Restriction Imposes A "Substantial Burden" on Chaplains' Free Exercise Rights.

The initial question is whether the defendants' prohibition on military chaplains' encouragement of congregants to contact Congress imposes a "substantial burden" on their free exercise rights. The plaintiffs argue that the prohibition constitutes a substantial burden because the preaching of military chaplains is censored. The defendants counter that the plaintiffs have not shown that "it is an important component of their religion that they use the military or their conditionally conferred status as military officials to advance their religious beliefs or lobbying efforts." *Defendants' Summary Judgment Memorandum* at 31. According to the defendants, the RFRA does "not confer on any individuals the right to conscript unwilling third parties, the government, or employers into joining their religious exercise." *Id.*

As discussed above, military chaplains do not invoke the official imprimatur of the military when they give a sermon; they are acting in a religious capacity, and, therefore, it is wholly appropriate for them to "advance their religious beliefs" in that context. Also, it is not for this Court to determine whether encouraging parishioners to contact Congress on the Partial Birth Abortion Ban Act is an "important component" of the Catholic or Jewish faiths. *See Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("The determination of what is a 'religious' belief or practice ... is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."). Encouraging parishioners to contact Congress on abortion legislation appears to be no less important to the Catholic faith or to Orthodox Judaism than other religiously-motivated

activity courts have held to be important enough to a religion such that its prohibition amounts to a substantial burden. *See Western Presbyterian Church v. Bd. of Zoning Adjustment of the District of Columbia*, 862 F.Supp. 538, 545–46 (D.D.C.1994) (Sporkin, J.) (Church's program to feed the needy); *Sasnett v. Sullivan*, 91 F.3d 1018, 1022 (7th Cir.1996) (wearing a crucifix around one's neck).

Finally, the defendants have proffered no evidence whatsoever that Rabbi Kaye's or Father Rigdon's congregants are "unwilling conscripts" or a "captive audience" to their allegedly political messages. Congregants know that religious sermons are not military orders. Service members know that there is no official requirement that they attend religious services; such a requirement would be unconstitutional. In fact, the plaintiffs have submitted undisputed evidence that congregants are not only willing, but at times want to hear what their spiritual leaders have to say about a whole host of subjects. *See Declaration of John M. Johnston* at ¶ 3.

### 2. The Defendants' Speech Restriction Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest.

The next question is whether the substantial burden on the plaintiffs' free exercise rights is the least restrictive means of furthering a compelling governmental interest. The defendants argue that the anti-lobbying restriction is "meant to maintain a politically disinterested military establishment under civilian control ... serv[ing] both the stability of our democratic political system and the ability of the military to focus on its mission of military readiness and national defense." Also, these restrictions purportedly prevent "attempts to influence the political activities of others ... [and] undue interference in individual service members' rights to participate in their personal capacities in the political process." According to the defendants, these ends would not be served "if each chaplain were permitted to turn his or her ministry into a political action forum. Political conflicts within the service ranks could easily arise from different religions or de-

nominations instructing their members to lobby differently from one another on particular political issues." *Defendants' Opposition* at 17.

■ A politically-disinterested military, good order and discipline, and the protection of service members' rights to participate in the political process are compelling governmental interests, but the defendants have not shown how these interests are in any way furthered by the restriction on the speech of military chaplains. Relying on nothing more than what they claim is "common sense," the defendants assert that if service people receive different religious counsel on lobbying, "[p]olitical conflicts" will result. They further assert that "[c]onflicts of this nature could severely undermine military discipline, cohesion, and readiness to the serious detriment of the National Security." *Defendants' Summary Judgment Memorandum* at 24.

It is difficult to understand why the defendants have singled out for proscription a seemingly innocuous request to congregants to write to Congress. There is no suggestion that Rabbi Kaye or Father Rigdon wish to have their congregants "proselytize" their fellow soldiers on the morality of a piece of abortion legislation or encourage their fellow troops to contact Congress. While this Court should be deferential to what the defendants "perceive[ ] to be a clear danger to the loyalty, discipline, or morale of troops," [9] the defendants have failed to submit any evidence showing how Rabbi Kaye's or Father Rigdon's contemplated speech would in

any way enhance a potential for "political conflicts" that the defendants already tolerate, let alone create a clear danger to the loyalty, discipline or morale of the troops. [10]

■ Recently, this Circuit held under the RFRA that the federal government's interest in eradicating sex discrimination—a compelling governmental interest [11]—was outweighed by a religious university's right to autonomy in its employment of ministers. *See Equal Employment Opportunity Commission v. Catholic Univ. of Am.*, 83 F.3d 455, 467–68 (D.C.Cir.1996). Here, the compelling interests advanced by the military are outweighed by the military chaplains' right to autonomy in determining the religious content of their sermons, especially because the defendants have failed to show how the speech restriction as applied to chaplains advances these interests. [12]

## D. The Defendants' Interpretation of Directive 1344.10 Violates the Chaplains' Free Speech Rights under the First Amendment.

The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The three types of forums that may exist on government property are (1) traditional public forums, (2) designat-

**9.** *Greer v. Spock,* 424 U.S. 828, 840, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1975).

**10.** *Cf. Ethredge v. Hail,* 56 F.3d 1324, 1328 n. 3 (11th Cir.1995) (holding that a military commander had supported his assertion that a bumper sticker disparaging the President would undermine military order, discipline and responsiveness where the record showed that service members had complained that the sticker was offensive and anonymous callers had contacted the commander and said that they intended to break the windows of the truck displaying the bumper sticker). *See also Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 810, 105 S.Ct. 3439, 3453, 87 L.Ed.2d 567 (1985) (holding that the government's exclusion of a legal defense fund from participation in a charity drive aimed at federal employees on the

ground that its exclusion was necessary to avoid workplace controversy was justified by numerous letters and telephone calls from federal employees, evidence of extra effort to persuade disgruntled employees to contribute, and evidence of declining contributions).

**11.** *See Roberts v. U.S. Jaycees,* 468 U.S. 609, 623–24, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984) (holding that a state government had a compelling interest in eradicating sex discrimination).

**12.** Because the Court has held that the plaintiffs' free exercise rights under the Religious Freedom Restoration Act have been violated, it need not reach the question of whether their free exercise rights under the First Amendment also have been violated.

ed public forums, and (3) nonpublic forums. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. Traditional public forums are places such as streets and parks that "by long traditional ... have been devoted to assembly and debate." *Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Designated public forums are those "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449.

"The touchstone for determining whether government property is a designated public forum is the government's intent in establishing and maintaining the property." *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988) (citing *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449). A court may examine "the nature of the property and its compatibility with expressive activity to discern the government's intent." *Stewart,* 863 F.2d at 1016 (quoting *Cornelius,* 473 U.S. at 802–03, 105 S.Ct. at 3448–49).

■ There is no dispute that the government has, by statute and regulation, institutionalized the provision of religious services in the Armed Services by creating the office of the chaplaincy and by dedicating facilities and personnel sufficient "to satisfy the religious needs of military members and their families and thus further to provide for the free exercise of religion by members of the Armed Forces ..." *Defendants' Summary Judgment Memorandum* at 6.[13] Thus, it has been the government's clear intent that certain facilities on military property (e.g., chapels) and personnel (e.g., chaplains) be dedicated exclusively to the free exercise rights

of its service people. The religious nature of these military facilities, therefore, is wholly compatible with expressive activity; indeed, the very purpose underlying these facilities is expressive, religious activity.

■ The question remaining is whether the defendants' anti-lobbying restriction comports with the designated public forum doctrine. At oral argument, defendants' counsel contended that the restriction is content-neutral because it applies "regardless of the candidate or issue" and that granting an exception for chaplains would enmesh the military in having to make content-based distinctions. The defendants' concern rings hollow, because the military already has made not only a content-based, but a viewpoint-based, distinction by favoring the religious views of one chaplain (Captain Friel) over another's (Father Rigdon's).

During the Project Life Post Card Campaign last summer, Captain John F. Friel, a Catholic priest on active duty in the United States Navy, spoke masses at the U.S. Naval Academy Chapel. Captain Friel told his parishioners about Navy policy prohibiting service members from using their official position to lobby for a particular candidate or issue. He further told them "that in (his) opinion, they were sophisticated enough to know how to contact their senators and congressmen if the [sic] felt the need to do so,.. and if their conscience called them to write to their congressmen and senators, they knew how to contact them." *Declaration of Captain John F. Friel* at ¶ 5. Unlike Father Rigdon, Captain Friel did not believe that urging Congress to vote in favor of the Partial Birth Abortion Ban Act was mandated by the Catholic faith.

**13.** *See also Plaintiffs' Exhibit 23, Chaplain Activities in the United States Army, Army Regulation 165–1, § 2–3b. (August 31, 1989)* ("[I]n providing religious services and ministries in many forms to the command and its members, the chaplaincy is an instrument of the U.S. Government to ensure that religious 'free exercise' rights are protected."); *Plaintiffs' Exhibit 24, Air Force Policy Directive 52–1, ¶ 1–1 (September 7, 1993)* ("The Air Force provides the opportunity for military members and their families to exercise [the right of freedom of religion] by providing chaplain service personnel and allocating required resources."); *Plaintiffs' Exh. 25, Air Force Instruction 52–101, ¶ 1.4 (January 28, 1994)* at ¶ 3.4 (precluding the use of "the chapel sanctuary, chancel, or nave to conduct non-religious activities"); 10 U.S.C. § 3073 (West 1959) (establishing institution of chaplaincy in the Army); 10 U.S.C. § 3547 (West 1959) (requiring chaplains to hold religious services at least once on each Sunday and to perform religious burial services; requiring the furnishment of facilities to assist the chaplain in performing his duties).

While Captain Friel's speech is permissible, Father Rigdon's speech is not. Therefore, although the defendants claim otherwise, they have sanctioned one view of Catholicism (it is not necessary to write to Congress) over another (it is necessary). Such favoritism not only impinges on Father Rigdon (and on Rabbi Kaye because of his view of Judaism), but on their congregants, because these chaplains are not free to advocate what they believe to be appropriate religious conduct. If, after an emotional sermon about the "abomination" of partial birth abortion, congregants were to rise from the pews and ask Father Rigdon or Rabbi Kaye what they can do to stop this practice, these chaplains would have to respond, "I cannot say." This muzzling of religious guidance is the direct result of the defendants' viewpoint discrimination.[14]

Viewpoint discrimination in a designated public forum "is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, ——, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995). The speech at issue here is within the forum's limitations. Other than the defendants' erroneous interpretation of Directive 1344.10, the statutes and regulations cited above evidence a government intent to treat religious speech on a military base on par with religious speech off base, in order to respect the free exercise rights of service personnel.

The defendants counter that Father Rigdon's and Rabbi Kaye's contemplated speech is really "political," not religious. The defendants, however, provide no basis for the Court in this case to distinguish the political from the religious. For example, Father Rigdon's desire to urge his Catholic parishio-

ners to contact Congress on legislation that would limit what he and many other Catholics believe to be an immoral practice—partial birth abortion—is no less religious in character than telling parishioners that it is their Catholic duty to protect every potential human life by not having abortions and by encouraging others to follow suit. Writing to Congress is but one way in which Catholics can fulfill this duty, and it coincidentally involves communicating with the political branches of government.

Even assuming *arguendo* that Father Rigdon's intended speech is in some sense political, it is not the role of this Court to draw fine distinctions between degrees of religious speech and to hold that religious speech is protected but religious speech with so-called political overtones is not. *See Widmar v. Vincent,* 454 U.S. 263, 270 n. 7, 102 S.Ct. 269, 274 n. 7, 70 L.Ed.2d 440 (1981) (refusing to hold that "religious worship" is unprotected speech while speech about religion is protected; "even if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer"). Accordingly, Father Rigdon's and Rabbi Kaye's intended speech lies within the limitations on the religious forum in which they speak.

To overcome the presumption of impermissibility, the defendants must show that their content- and viewpoint-based restriction is "necessary to serve a compelling ... interest and that it is narrowly drawn to achieve that end." *Widmar,* 454 U.S. at 270, 102 S.Ct. at 274; *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273, 1279–80 (10th Cir. 1996) (holding that viewpoint-based restriction of speech in designated public forum must be " 'narrowly drawn to effectuate a compelling state interest' ") (quoting *Perry Educ. Assn. v. Perry Local Educators' Assn.,*

---

**14.** The anti-lobbying restriction is content- and viewpoint discriminatory, even apart from the defendants' favoritism of Captain Friel's brand of Catholicism. Contrary to defendants' counsel's claim at oral argument, that the anti-lobbying restriction applies "regardless of the candidate or issue" does not render it content-neutral. The fact remains that the restriction prohibits a particular class of speech—speech in which a chaplain urges a congregant to contact Congress on pending legislation. It also is viewpoint-based,

because while it prohibits the use of official authority or influence to encourage the solicitation of Congressional votes, it does not preclude chaplains from *discouraging* their congregants from contacting Congress on pending legislation. The latter speech would comply with the anti-lobbying restriction, because chaplains would be asking parishioners not to communicate with Congress and, therefore, not to lobby for the votes of Congress on pending legislation.

460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). As discussed above in connection with the Religious Freedom Restoration Act, the defendants have not made this showing.

**E. The Plaintiffs Are Entitled to a Preliminary Injunction and to Summary Judgment.**

To obtain a preliminary injunction, the plaintiffs must show that (1) they have a substantial likelihood of succeeding on the merits; (2) they will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest will be furthered by the injunction. *See Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989).

■ The plaintiffs have met their burden. First, they are likely to succeed on the merits, because the Court already has found above that the defendants unlawfully have impinged upon their free exercise and free speech rights. Second, if the defendants' conduct is not enjoined, the plaintiffs will suffer irreparable harm to their constitutional and statutory rights to preach without being censored. Third, the defendants have not pointed to a single person or interest that would be substantially harmed if their conduct is enjoined; rank speculation about interference with good order and discipline or the political rights of soldiers does not suffice. Fourth, an injunction will serve the public interest by protecting the free speech and free exercise rights of chaplains and observant soldiers. Again, there is no evidence that military readiness or efficiency would be jeopardized by permitting chaplains to preach in accordance with their religious beliefs.

In addition to injunctive relief, summary judgment must be rendered for the plaintiffs if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As discussed above, the undisputed material facts show the defendants' anti-lobbying proscription violates the plaintiffs' First Amendment rights and their rights under the Religious Freedom Restoration Act. Accordingly, the plaintiffs' also are entitled to judgment as a matter of law.

**IV.**

**CONCLUSION**

What we have here is the government's attempt to override the Constitution and the laws of the land by a directive that clearly interferes with military chaplains' free exercise and free speech rights, as well as those of their congregants. On its face, this is a drastic act and can be sanctioned only by compelling circumstances. The government clearly has not met its burden. The "speech" that the plaintiffs intend to employ to inform their congregants of their religious obligations has nothing to do with their role in the military. They are neither being disrespectful to the Armed Forces nor in any way urging their congregants to defy military orders. The chaplains in this case seek to preach only what they would tell their non-military congregants. There is no need for heavy-handed censorship, and any attempt to impinge on the plaintiffs' constitutional and legal rights is not acceptable.

For all the foregoing reasons, the Court grants the plaintiffs' motion for preliminary injunction and motion for summary judgment, and denies the defendants' motion to dismiss or for summary judgment.

**ORDER**

This matter came before the Court on the parties' cross-motions for summary judgment and on the plaintiffs' motion for preliminary injunction. For the reasons stated in the Court's Memorandum Opinion of even date herewith, it is, by the Court, this 7th day of April, 1997,

ORDERED that the plaintiffs' motion for preliminary injunction is GRANTED; and it is

FURTHER ORDERED that the plaintiffs' motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that the defendants' motion to dismiss, or, in the alterna-

**166**

tive, for summary judgment is DENIED; and it is

FURTHER ORDERED that the plaintiffs' motion to amend the complaint to add Chief Warrant Officer John M. Johnston and Cheryl M. Johnston as party plaintiffs is hereby denied as MOOT; and it is

DECLARED that the speech contemplated by the plaintiffs, to urge their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act, does not violate Department of Defense ("DoD") Directive 1344.10 and any other military regulation based thereon; and it is

FURTHER DECLARED that the defendants' interpretation of DoD Directive 1344.10 and similar regulations as barring the plaintiff chaplains from urging their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act violates the plaintiffs' rights under the First Amendment and the Religious Freedom Restoration Act; and it is

FURTHER ORDERED that the defendants, the defendants' officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the defendants who receive actual notice of this order are hereby ENJOINED from interpreting DoD Directive 1344.10, or any similar law or regulation, in a manner that prohibits the plaintiffs from exercising their free speech and free exercise rights under the First Amendment of the Constitution, and in particular from urging their military congregants to communicate with Congress on passage of the Partial Birth Abortion Ban Act; and it is

FURTHER ORDERED that because the Court has granted summary judgment in this case, the Clerk is directed to dismiss this case from the docket of this Court.