**David E. TIPPETT, Plaintiff–Appellant,**

**v.**

**UNITED STATES, Defendant–Appellee.**

**No. 98–5005.**

United States Court of Appeals, Federal Circuit.

June 18, 1999.

David E. Tippett, pro se, of Zachary, Louisiana.

Salomon Gomez, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director, and Anthony H. Anikeeff, Assistant Director.

Before PLAGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

David E. Tippett appeals the decision of the United States Court of Federal Claims that dismissed his suit seeking back pay and reinstatement in the United States Army. *Tippett v. United States,* No. 96–308C (Fed.Cl. Aug. 21, 1997). In his complaint, Tippett alleged, among other things, that his discharge was involuntary because he had requested it after receiving erroneous advice from a government-provided military lawyer. In due course, the government moved to dismiss the complaint for lack of jurisdiction or for failure to state a claim upon which relief could be granted, pursuant to Rules 12(b)(1) and (4) of the Court of Federal Claims. In the alternative, the government moved for summary judgment on the administrative record, pursuant to RCFC 56.1. For his part, Tippett opposed the motion to dismiss and cross-moved for summary judgment. After considering the parties' motions and hearing oral argument, the court granted the government's motion to dismiss for lack of jurisdiction because it concluded that Tippett had failed to establish that his discharge was involuntary. Because we conclude that, in the trial court, Tippett presented non-frivolous allegations of involuntariness, we vacate and remand.

## BACKGROUND

### I.

The following facts are undisputed: Tippett was commissioned in the United States Army as a second lieutenant in May of 1977. At the time of the events giving rise to this case, he had attained the rank of captain and was stationed in Wuerzburg, Germany, where he was the Public Affairs Officer for the 3rd Infantry Division.

In January of 1989, Tippett's superiors became aware that he had been involved in an extra-marital relationship with a civilian co-worker in the Public Affairs Office. After admitting to the relationship, Tippett was relieved of his duties as Public Affairs Officer on January 29, 1989. Subsequently, he received an adverse Officer Efficiency Report ("OER") for the period July 25, 1988, through January 29, 1989. The OER

stated that the extra-marital relationship had contributed to the degradation of Tippett's unit and had prevented Tippett from properly motivating his subordinates.

After receiving the adverse OER, Tippett consulted with Army Trial Defense Service ("TDS") lawyer Captain Thomas Barth. Subsequently, on April 14, 1989, Tippett submitted a response to the OER in which he asserted that the OER did not accurately reflect his performance of duty during the applicable time frame. Specifically, Tippett contended that the Public Affairs Office had not suffered a degradation of performance and that he had in fact motivated his subordinates. In his response to the OER, Tippett stated that "the OER will prohibit me from obtaining a Reserve commission and serving my country in time of war." In due course, Tippett was informed that, because he was the subject of an investigation that could lead to disciplinary action, pursuant to Army Regulation ("AR") 624–100, ¶ 2–10, his promotion to major, scheduled for February 1, 1989, would be delayed.

On August 18, 1989, Tippett was ordered to show cause why, in view of his "substandard performance of duty and misconduct," he should be retained on active duty. The order informed Tippett that the options available to him included: (i) submitting a resignation in lieu of elimination pursuant to AR 635–120, chapter 4; (ii) requesting a discharge in lieu of elimination pursuant to AR 635–120, chapter 8; or (iii) in lieu of resignation or discharge, requesting an appearance before a board of inquiry in order to show cause for retention.

On January 16, 1990, Captain Barth temporarily returned to the United States. In Barth's absence, Tippett met with another TDS lawyer (Tippett's "second lawyer") for advice on whether to resign, request a discharge, or appear before the board of inquiry to show cause for retention on active duty. In paragraphs 54, 55, and 56 of his complaint in the Court of Federal Claims, Tippett described as follows his dealings with his second lawyer

(referenced in the complaint as "RDC Counsel") and his ensuing request for a discharge:

54.... The RDC Counsel did tell plaintiff that he had spoken with the 3ID [3rd Infantry Division] Deputy SJA [Staff Judge Advocate] and that the command would recommend an honorable discharge if plaintiff would resign.... During this meeting, plaintiff asked the RDC Counsel what was the difference between resignation and a discharge. The RDC Counsel advised plaintiff that a "discharge would allow [plaintiff] to go into the Reserves ... because it [was] not a resignation of the commission, you still hold the commission, but it is just a discharge from active service." The RDC Counsel told plaintiff that he would double check with both PERSCOM and the Department of the Army to make sure this information was correct.... Plaintiff and the RDC Counsel agreed to meet again on March 14, 1990.

On March 14, 1990 plaintiff met again with his attorney, the RDC Counsel. At that time, the RDC Counsel confirmed that plaintiff would be commissioned in the United States Army Reserves (USAR) at the time of separation. The RDC Counsel presented plaintiff with two memorandums. One was to OTJAG [Office of the Judge Advocate General] requesting copies of any investigative reports or summaries arising from alleged unethical conduct by the 3ID SJA. The second was a memorandum to PERSCOM in which plaintiff requested discharge from the United States Army under the provisions of Chapter 8, AR 635–120. On the advice of his attorney, the RDC Counsel, plaintiff signed both memorandums. The RDC Counsel forwarded the memorandums to the appropriate authority in the chain of command.

Plaintiff's chain of command recommended that plaintiff be issued an honorable discharge.

The reference in paragraph 55 of the complaint to "investigative reports or summaries" was to reports or summaries relating to an investigation that was being conducted concerning the SJA for the 3rd Infantry Division. The investigation focused on the conduct of the SJA in connection with the original investigation of Tippett's extra-marital relationship with a civilian employee in the Public Affairs Office.

On March 28, 1990, Captain Barth returned to Germany and resumed his representation of Tippett. Shortly thereafter, on April 19, 1990, Colonel Wayne Iskra was asked to investigate allegations concerning Tippett's second lawyer, who had advised Tippett while Captain Barth was in the United States. Colonel Iskra's investigation grew out of allegations that surfaced in the course of the above-noted investigation into the conduct of the 3rd Infantry Division SJA in connection with the original investigation of Tippett's extra-marital relationship. The thrust of the allegations was that Tippett's second lawyer had a conflict of interest when he represented Tippett because, prior to representing Tippett, he had written a memorandum in support of the SJA's actions taken against Tippett. In the course of the investigation, Tippett provided a sworn statement to Colonel Iskra. On May 25, 1990, Colonel Iskra submitted the report of his investigation. He concluded that Tippett's second lawyer had acted improperly by representing Tippett when Tippett was not aware of the fact that, before representing him, the lawyer had written a memorandum supporting the SJA. Eventually, Tippett's second lawyer received a letter of reprimand for having signed the memorandum supporting the SJA and for having then represented Tippett.

On June 1, 1990, Tippett was honorably discharged and received a certificate to that effect. Tippett's discharge also was memorialized in Department of Defense Form 214, titled "Certificate of Release or Discharge from Active Duty" ("DD Form 214"). DD Form 214 is a standard separation document. *See* AR 635-5, Table 1-1.

Paragraph 1-4a of AR 635-5 provides, in pertinent part, that a DD Form 214 "will be prepared for all personnel . . . at the time of retirement, discharge, or release from the Active Army." The form is in two parts. The first part consists of Blocks 1-22. Upon separation, the departing service member signs Block 21. The second part of the form consists of Blocks 23-30. These blocks appear under the heading "Special Additional Information (For use by authorized agencies only)." Three of those blocks are relevant to this case: numbers 23, 24, and 28. Block 23 is labeled "Type of Separation." Block 24 is labeled "Character of Service," while Block 28 is labeled "Narrative Reason for Separation." In Tippett's case, Block 23 contained the entry "Discharge," Block 24 the entry "Honorable," and Block 28 the entry "Misconduct, Moral or Professional Dereliction." Tippett asserts that he first learned of the entry in Block 28 when he was given the DD Form 214 on June 1, 1990.

In January of 1991, Tippett requested appointment in the United States Army Reserves ("Reserves"). In paragraph 69 of his complaint in the Court of Federal Claims, he recited that when he made the request, he sought "an exception to the regulatory policy declaring [plaintiff] ineligible for USAR appointment." The "regulatory policy" to which Tippett referred is set forth in AR 135-100, ¶ 1-7. Pursuant to ¶ 1-7, certain persons are not eligible for appointment in the Reserves unless a waiver is authorized. Among the persons for whom a waiver must be authorized are individuals, such as Tippett, who are discharged pursuant to a "[r]esignation for the good of the service in lieu of court-martial, involuntary separation, or any form of disciplinary or corrective action." AR 135-100, ¶ 1-7c(3). In Tippett's case, a waiver also was required by AR 135-100, ¶ 1-7e. Pursuant to that regulation, commissioned officers are ineligible for appointment in the Reserves unless their discharges are the result of being passed over for promotion twice, which was not

the case with Tippett. By letter dated August 13, 1991, the Army informed Tippett that his request for a waiver had been denied. The letter recited that Tippett's discharge for "misconduct, moral or professional dereliction" made him ineligible for appointment and that his "records and application letter did not reveal any unique qualifications which would justify granting this exceptional waiver."

## II.

In February of 1993, Tippett submitted an application to the Army Board for Correction of Military Records ("ABCMR" or "Board"). In it, he asked the Board to void his June 1, 1990 discharge, and all records relating to the discharge. He also sought retroactive restoration to active duty in a commissioned status, effective June 1, 1990, and correction of his records to show promotion to major. In addition, Tippett asked the Board to expunge all records pertaining to his alleged misconduct, including the adverse OER covering the period July 25, 1988, through January 29, 1989, as well as two subsequent OERs. Tippett also sought back pay and allowances. According to the Board, Tippett alleged that his admission of the extra-martial relationship was obtained illegally because he was not advised of his rights under the Uniform Code of Military Justice, and he claimed that his discharge was the result of this illegally obtained admission and "the improper actions taken by another commissioned officer at that time."

Tippett filed suit in the Court of Federal Claims on May 30, 1996, while his application before the ABCMR still was pending. In his complaint, Tippett alleged, among other things, that his request for discharge and his resultant discharge from the Army was involuntary because he was "improperly, incompetently, erroneously, and unjustly counseled and advised by the RDC Counsel, with respect to [ ] submitting his request for discharge, and [because he] improvidently acted upon such advice by the RDC." Tippett sought reinstatement in

the Army and back pay and allowances in the grade of captain from June 1, 1990. In addition, he asked the court to direct the Secretary of the Army to correct his records by voiding his discharge and by expunging from his records all material relating to the discharge. In addition, he asked the court to direct the Secretary to void and expunge from his records the OER covering the period July 25, 1988, through January 29, 1989, and the two subsequent OERs. On June 26, 1996, the ABCMR denied Tippett's application for correction of records. As noted above, a year later, the Court of Federal Claims dismissed Tippet's suit for lack of jurisdiction after it concluded that his discharge was voluntary. This appeal followed. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).[1]

## DISCUSSION

### I.

■ "Jurisdiction being a question of law," *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir.1992), we exercise complete and independent review of the Court of Federal Claims' conclusion that it lacked jurisdiction to entertain Tippett's suit. *See Adkins v. United States*, 68 F.3d 1317, 1321 (Fed.Cir.1995).

■ The Tucker Act gives the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, "is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). When a contract is not involved, to invoke

1. All references are to the 1994 version of the United States Code.

jurisdiction under the Tucker Act, a plaintiff must identify a constitutional provision, a statute, or a regulation that provides a substantive right to money damages. *See Hamlet v. United States,* 63 F.3d 1097, 1101 (Fed.Cir.1995). In other words, the plaintiff "must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998).

 For military personnel, 37 U.S.C. § 204 is a money-mandating statute. Section 204 provides that "a member of the uniform service who is on active duty" is "entitled to the basic pay of the pay grade to which assigned." An officer's right to pay under section 204 continues until the officer is properly separated from the service. *See Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 810 (Ct.Cl.1979) (en banc) (stating that § 204 "confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service" and serves as the basis for Tucker Act jurisdiction where a discharge is wrongful). If Tippett's discharge was involuntary and improper, his statutory right to pay was not extinguished and thus serves as a basis for Tucker Act jurisdiction. *See Adkins,* 68 F.3d at 1321. If, however, Tippett's discharge was voluntary, his right to pay ended upon his discharge. He thus would have retained no statutory entitlement to compensation, and consequently no money-mandating provision would support Tucker Act jurisdiction over his claim. *See id.*

 An otherwise voluntary resignation or request for discharge is rendered involuntary if it is submitted under duress or coercion, or results from misrepresentation or deception on the part of government officers. *See Scharf v. Department of the Air Force,* 710 F.2d 1572, 1574 (Fed. Cir.1983); *Covington v. Department of Health & Human Servs.,* 750 F.2d 937, 942

(Fed.Cir.1984); *Christie v. United States,* 207 Ct.Cl. 333, 518 F.2d 584, 588 (Ct.Cl. 1975).[2] Tippett asserts that his discharge was involuntary because it resulted from misrepresentations on the part of his second lawyer. Misrepresentation can be caused by providing misleading information or by failing to provide relevant information. *See Covington,* 750 F.2d at 943. Information is considered misleading if a reasonable person would have been misled by the representation. *See id.* at 942. "The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary." *Id.*

 Resignations or retirements are presumed to be voluntary. *See Staats v. United States Postal Serv.,* 99 F.3d 1120, 1123–24 (Fed.Cir.1996). To be entitled to a hearing on a claim of involuntariness, a plaintiff must make a threshold non-frivolous allegation that his discharge was involuntary. *See Dumas v. Merit Sys. Protection Bd.,* 789 F.2d 892, 894 (Fed.Cir. 1986); *Burgess v. Merit Sys. Protection Bd.,* 758 F.2d 641, 643 (Fed.Cir.1985). If the plaintiff alleges facts that would make out a prima facie case of involuntariness if proven, then he is entitled to a hearing on the voluntariness issue. *See Dumas,* 789 F.2d at 894.

## II.

 Tippett asserts two grounds for challenging the dismissal of his complaint. First, he argues that his second lawyer's conflict of interest tainted his discharge and rendered it involuntary. Second, he contends that his second lawyer misinformed him by failing to tell him that his discharge papers would indicate that his discharge was for a moral transgression, and by telling him that, if he received an honorable discharge, he would be entitled to an appointment in the Reserves. The

---

**2.** Although Tippett requested a discharge as opposed to resigning or retiring, we treat these forms of requested separation under the

same standard. *See, e.g., Adkins,* 68 F.3d at 1321 (using the terms "discharge" and "retirement" interchangeably).

first point requires little discussion. Tippett's second lawyer's conflict of interest, while an unfortunate circumstance, is not sufficient, by itself, to render his discharge involuntary. As discussed above, Tippett must put forth non-frivolous allegations that he was misinformed. The correctness of the information that Tippett received was not dependent upon his lawyer's conflict of interest. Instead, the issue is whether Tippett was misled.

 Turning to Tippett's claims of misinformation, the Court of Federal Claims found that Tippett's second lawyer "did not address the legal consequences of an Honorable Discharge with Notation." Noting that his second lawyer failed to tell him that his DD Form 214 would list the reason for discharge as "Misconduct, Moral or Professional Dereliction," Tippett states that he did not learn of this notation until he received the form on June 1, 1990. Tippett asserts that if he had known that this derogatory information would appear on the DD Form 214, he would not have requested a discharge and would not have waived his right to a hearing before the board of inquiry. The government does not dispute the court's finding that Tippett was not informed about the notation that would appear on his DD Form 214. It points out, however, that in his letter requesting discharge Tippett wrote, "I will be furnished an Honorable, General, or Other Than Honorable Discharge as determined by HQDA." It also points out that because various personnel documents initiating his separation from the Army referred to his misconduct, he reasonably should have known that his separation documents would reflect his misconduct. Under these circumstances, the government contends, the fact that Tippett's second lawyer failed to tell him that the derogatory notation would appear on his DD Form 214 was not prejudicial.

We are not persuaded by the government's argument. It is true that when he submitted his request for discharge, Tippett understood that he could receive a less than honorable discharge. However, there is nothing in the record before us that indicates he was aware of the fact that if he received an honorable discharge, it would be blemished. In other words, being aware that one may receive a less than honorable discharge is not the same as being aware that any honorable discharge one receives will carry with it a negative notation. Put another way, for all the record indicates, Tippett believed that it was possible that he would receive a "clean" honorable discharge. In fact, such a possibility did not exist. *See* AR 635–5, Table 2–1 (requiring entry of the reason for separation in Block 28 of DD Form 214). Moreover, Tippett has had to contend with the effect of the adverse notation, for he was required to explain the notation when he applied for admission to the Louisiana State Bar. As far as not being told that a negative notation would appear on his DD Form 214 is concerned, Tippett has made a non-frivolous allegation of involuntariness.

The second prong of Tippett's involuntariness claim is the contention that his second lawyer told him that if he was honorably discharged, he would receive an appointment in the Reserves. As noted above, Tippett made this allegation in paragraphs 54 and 55 of his complaint. In support of the allegation, Tippett points to a portion of the sworn statement he gave Colonel Iskra on May 23, 1990, in which he recounted his interaction with his second lawyer. In response to Colonel Iskra's question as to whether he had discussed with his second lawyer the differences between a resignation and a discharge, Tippett stated:

> I remember asking the difference between a discharge and a resignation, and we discussed the fact that a discharge would allow me to go into the Reserves, et cetera, et cetera, et cetera, because it is not a resignation of a commission, you still hold a commission, but it's just a discharge from active service. He said that he would double-check that with both PERSCOM and DA, and he said

that he did that ... when I met with him on the 14th. So after weighing those options, I did decide to sign the request for a discharge on the 14th of March.

When he made this statement, Tippett had received orders to return to the United States for discharge, but had not yet sought appointment in the Reserves. Because the statement was relatively contemporaneous with the events at issue and prior to Tippett learning that he could not get into the Reserves, the statement bears indicia of credibility.

In a sworn statement given to Colonel Iskra the following day, May 24, 1990, Tippett's second lawyer confirmed that he had discussed with Tippett the differences between a resignation and a request for discharge. In addition, he corroborated Tippett's statement that the lawyer had sought to confirm what he had told Tippett and that they had a second meeting on March 14, 1990:

> [H]e had asked me about what were the specific differences between a Chapter 4 [resignation] and a Chapter 8 [request for discharge] and I did not have that information at hand so I agreed to contact OTJAG and TAPA and the administrative law division at OJA in Heidelberg to try and pin down exactly why those two chapters were in the regulation, what differences there were, things of that nature.... The next session that I had with Captain Tippett would have been on the 14th of March.
>
> \* \* \* \* \* \*
>
> And at that point, I was able to answer his questions about the differences between a Chapter 4 and Chapter 8, and we discussed that. He elected at that point to submit the request for discharge in lieu of going in front of an elimination board proceeding. We talked about how long it was going to take to process it, things of that nature, and then I told him that I would give it to Major King that day, that afternoon. I also told him again that I had obtained an assurance from Major King that the

chain of command would recommend an honorable discharge if Captain Tippett submitted this paperwork in lieu of going to an elimination board.

The government urges us to reject Tippett's claim that his request for discharge was involuntary because he submitted it after having been told that if he was honorably discharged, he would be appointed in the Reserves. The government contends that we should affirm the Court of Federal Claims' rejection of Tippett's claim that he was misinformed by his second lawyer. Noting the statements given by Tippett and his second lawyer to Colonel Iskra, the court stated that the lawyer's statement "[did] not comport with Tippett's substantive account of the conversation." The court further stated that the lawyer's statement "[did] not confirm that [Tippett's lawyer] advised that Chapter 8 guarantees a Reserve commission upon receipt of an honorable discharge." The court also discounted Tippett's statement because when Colonel Iskra asked Tippett whether he believed that his second lawyer properly advised him with respect to his options, Tippett responded:

> I think his advice about the resignation versus discharge versus Board of Inquiry was very good, and that I probably got the best deal that I was going to get by going that way. So yes, he probably gave me good advice.

We are unable to sustain the ruling of the Court of Federal Claims on this point. First, the statement by Tippett's second lawyer supports many details recalled by Tippett. Second, while the court did correctly point out that the "statement does not confirm that [Tippett's lawyer] advised that Chapter 8 guarantees a Reserve commission upon receipt of an honorable discharge," the statement does not rebut Tippett's statement that his lawyer gave him the alleged advice.

In regard to Tippett's statement to Colonel Iskra that the advice he received from his second lawyer was "very good," it is enough simply to note that the state-

ment was made prior to Tippett's discharge and prior to his applying for an appointment in the Reserves. On the present record, nothing had occurred to dispel Tippett's impression that the advice he had received from his second lawyer was correct. Tippett may not have realized that he was misinformed until he subsequently received a discharge with a negative notation and was denied an appointment in the Reserves.

It is uncontested that the alleged advice, if given, was erroneous. As already noted, absent a waiver, the circumstances surrounding Tippett's discharge made him ineligible for an appointment in the Reserves under at least two provisions of Army Regulations, AR 135–100, ¶ 1–7c(3) and ¶ 1–7e. We view this case as analogous to *Scharf v. Department of the Air Force,* 710 F.2d 1572 (Fed.Cir.1983). There, a government employee was misinformed by an agency counselor that there would be no disadvantage if his application for optional retirement preceded his application for disability retirement. *See id.* at 1573–74. We held that it was reasonable for the employee to rely on the counselor's erroneous advise, and that the advice was misleading and materially affected the employee's decision regarding retirement. *See id.* at 1575. Because the employee relied on the misleading advice to his detriment, his retirement was involuntary. *See id.*

Based upon the foregoing analysis, we conclude that Tippett has advanced non-frivolous allegations to the effect that his discharge was involuntary. Accordingly, we vacate the decision of the Court of Federal Claims and remand the case to the court for further proceedings. Because Tippett has asserted facts, if proven, that are sufficient to make out a prima facie case of involuntariness, he is entitled to an evidentiary hearing on the voluntariness issue. As far as what Tippett was told by his second lawyer, since it is undisputed that he was not informed that a negative notation would appear on his DD Form 214, the only issue to be decided is whether, as Tippett asserts, he was incor-

rectly advised that if he was granted an honorable discharge, he would be entitled to an appointment in the Reserves. On the present record, Tippett's assertion that he was so advised is unrebutted.

Beyond the matter of what Tippett was told by his second lawyer, there is a second factual issue relating to the voluntariness issue that should be addressed. As noted above, Captain Barth, Tippett's original TDS lawyer, returned to Germany at the end of March, 1990. Tippett has acknowledged that he consulted with Barth on May 22, 1990, because he had "some real concerns and questions about what was going on." On that date, Tippett would have been able to withdraw his request for discharge pursuant to AR 635–120, ¶ 2–4, which provides that a request for withdrawal of a request for discharge may be made at any time prior to commencing travel pursuant to orders issued for the purpose of separating the officer. Tippett has never alleged that he was misinformed by Barth. If the Court of Federal Claims finds that Barth cured any misinformation that Tippett received while Tippett had the option to withdraw his request for discharge, then Tippett's discharge was not based on misinformation and was voluntary. *See Scharf,* 710 F.2d at 1575 (holding that the misinformation must be such that a "reasonable person would have been misled."). That being said, we leave it to the Court of Federal Claims to structure the remand proceedings.

### III.

One final point should be mentioned. At the end of its decision, referring to the decision of the ABCMR, the Court of Federal Claims stated:

The Board's decision was not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. The decision was based on plaintiff's substandard OERs. There is no showing that those were defective or improper. They show

that plaintiff's misconduct impeded his ability to perform his duties.

As seen earlier, when Tippett filed suit in the Court of Federal Claims on May 30, 1996, the ABCMR had not yet rendered a decision on his application for correction of records. Thereafter, on October 8, 1996, after being advised by the government that the Board had denied Tippett's application, the court directed the government to file the administrative record from the Board as soon as it became available. On November 15, 1996, the administrative record was filed under seal. A week later, the government filed its motion to dismiss or, in the alternative, for judgment on the administrative record. Tippett opposed the motion to dismiss and cross-moved for summary judgment.

The court heard argument on the parties' motions on June 23, 1997. At argument, Tippett stated to the court that he had "two causes of action." Tippett described his first cause of action as being based on the fact that he was "illegally, improperly, erroneously, and wrongfully discharged from the United States Army." Referring to this cause of action, Tippett stated that his military attorney "gave the Plaintiff erroneous advice, upon which the Plaintiff detrimentally relied." Tippett described his second cause of action as follows: "The OER which led to the Plaintiff's elimination action was prepared in violation of the statutes of the United States and Army Regulations. Therefore, it is illegal, and the actions flowing from it are invalid." After Tippett's opening statement, the June 27 proceedings focused entirely on the voluntariness issue, with no further mention being made of Tippett's second cause of action.

As far as we can tell from the record, Tippett never sought to amend his complaint to incorporate in his action a challenge to the decision of the ABCMR, and at the June 27 proceedings there was no discussion of the Board's decision. Under these circumstances, and in view of the fact that the Court of Federal Claims dismissed Tippett's complaint for lack of jur-

isdiction, we read the statement of the court referring to the ABCMR decision that we have quoted as simply a further articulation of the rejection of Tippett's claim that his resignation was involuntary. We do not read the statement as in any way addressing any of the matters raised before, and decided by, the Board, including Tippett's challenge to the OER covering the period July 25, 1988, through January 29, 1989, his second cause of action. Indeed, since the court dismissed Tippett's complaint for lack of jurisdiction, it would not have been appropriate for it to address the merits of the case.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is vacated. The case is remanded to the court for further proceedings consistent with this opinion.

*VACATED and REMANDED.*