# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 15, 2006     Decided November 28, 2006
                             Reissued December 4, 2006

No. 05-5196

D. PHILIP VEITCH, REV.,
APPELLANT

v.

GORDON R. ENGLAND, SECRETARY OF THE NAVY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02982)

---

*Arthur A. Schulcz, Sr.* argued the cause and filed the briefs for appellant.

*Lowell V. Sturgill, Jr.*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, U.S. Department of Justice, *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Robert M. Loeb*, Attorney.

Before: SENTELLE and ROGERS, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Concurring opinion filed by *Circuit Judge* ROGERS.

SILBERMAN, *Senior Circuit Judge*: Rev. D. Philip Veitch, formerly a Lieutenant Commander in the Navy Chaplain Corps, appeals from the district court's grant of summary judgment to the Navy. His complaint alleged that he had been constructively discharged for unconstitutional reasons; that the Navy had forced him out of the service in violation of his First Amendment rights to free speech and free exercise of religion and in contravention of the Establishment Clause. The district court concluded that since Veitch had resigned voluntarily, he lacked standing to bring his constitutional claims. We affirm.

I

Veitch is an evangelical Protestant minister in the Reformed Episcopal Church. He joined the Navy Chaplain Corps in 1987 and from June 1987 until September 2000 served in the Corps as a commissioned officer, ultimately reaching the rank of Lieutenant Commander. This case has its origin in a recurrent dispute that took place between Rev. Veitch and his command chaplain, Captain Ronald J. Buchmiller, during Veitch's assignment to the Naval Support Activity, Naples, Italy ("NSA Naples").

Essentially, Veitch claims that Captain Buchmiller, a Catholic priest, clashed with him because of Buchmiller's intolerance for Veitch's conservative Protestant religious beliefs and practices. There seems to be little doubt that the

relationship between the two was quite unfriendly, and, according to Veitch, Buchmiller repeatedly criticized him for his insistence on preaching *sola scriptura*—the doctrine that Biblical teaching alone is authoritative, which is accepted by many Protestant faiths but rejected by Catholic and Orthodox churches. Continued friction led Veitch to send rather caustic e-mails to Buchmiller and to file an Equal Opportunity Complaint ("EO Complaint") seeking relief from Buchmiller's harassment.

Commander Lawrence Zoeller, a medical service officer, was assigned to investigate Veitch's complaint. Zoeller concluded that Veitch's allegation of religious discrimination was unsubstantiated. In explaining his decision to recommend denying Veitch's complaint, Zoeller described what he perceived to be the Navy's requirement of pluralism among religions. Zoeller determined that Veitch had failed to satisfy the basic tenet of pluralism in his preaching, and that Buchmiller had been correct to counsel Veitch on this problem. Zoeller also found that Veitch's preaching was derogatory toward other faiths. Zoeller transmitted his report to Captain John J. Coyne, the commanding officer at NSA Naples. After reviewing Zoeller's report along with some of the e-mails sent from Veitch to Buchmiller, Coyne contacted Buchmiller to inform him that Veitch's behavior, as evidenced by his e-mails, demonstrated an unacceptable lack of respect for a superior officer and should not be tolerated in the future.

Thereafter, Veitch claims that Buchmiller tore a Reformation Conference poster off his wall and continued to harass and criticize him. Veitch claims that he was on the verge of filing a second EO Complaint in response to Buchmiller's continued hostility. In the end, Veitch chose not to file, but he did send Buchmiller a fateful e-mail on February 8, 1999. Veitch's rebarbative missive was a four-page broadside attack on Buchmiller's command and character. This e-mail prompted

Coyne to bring non-judicial punishment against Veitch in the form of a Captain's Mast. Veitch was presented with a charge sheet in February; he was charged with "disrespect towards a superior commissioned officer" under Article 89 of the Uniform Code of Military Justice ("UCMJ"). 10 U.S.C. § 889 (2000). He was also charged under Article 86 of the UCMJ with "failure to go to appointed place of duty," 10 U.S.C. § 886, for having missed four staff meetings, without justification, in late 1998. Veitch consulted with his Navy attorney and refused non-judicial punishment. Coyne then decided to bring the same charges against Veitch at court-martial.

After further consultation with counsel, Veitch submitted his resignation, which Coyne endorsed. Coyne did not further pursue the court-martial charges, but instead issued Veitch a Nonpunitive Letter of Caution. In April 1999, Veitch wrote to the Department of Defense Inspector General ("DoDIG") alleging that Coyne and Buchmiller had engaged in acts of reprisal for his decision to file the EO Complaint; he requested that the DoDIG investigate the circumstances surrounding his resignation. In May, the Navy approved Veitch's resignation and set a November separation date. However, in July, when the DoDIG agreed to investigate Veitch's complaint through the Navy Inspector General ("NIG"), Veitch requested permission to withdraw his resignation. Veitch's new commanding officer, Captain Brendan L. Gray, strongly recommended disapproval of Veitch's request, and the Navy denied his request in August 1999. But in early November, the Secretary of the Navy suspended Veitch's resignation orders until the completion of the NIG investigation into Veitch's retaliation complaint. On May 23, 2000, the NIG completed its report, which found that Veitch's allegations of reprisal were unsupported. With the retaliation inquiry complete, Veitch was finally separated from the Navy on September 30, 2000.

Veitch then sued the Navy and several of its officers in federal district court in December 2000. Veitch included with his complaint a motion for a preliminary injunction. The district court denied Veitch's motion. *See Veitch v. Danzig*, 135 F. Supp. 2d 32 (D.D.C. 2001). Defendants then filed a motion to dismiss, which was granted in part and denied in part. The court also ordered Veitch to file an amended complaint or face dismissal of his entire case. *See Veitch v. Danzig*, Civ. No. 00-2982 (D.D.C. Aug. 30, 2001) (memorandum and order). Veitch then filed a six-count amended complaint alleging Free Speech, Establishment, and Free Exercise claims; Fifth Amendment claims; claims for constructive discharge; and violations of the Religious Freedom Restoration Act ("RFRA"). The district court granted summary judgment for defendants.

II

Veitch would have us confront a rather troubling constitutional question: whether chaplains in the armed services can be required to endorse "pluralism" in their religious practices. The services are understandably concerned about unit morale. And those of us old enough to remember World War II movies will recall scenes of chaplains at the front line performing services for soldiers of different religions. On the other hand, Veitch's argument that a chaplain cannot be obliged to preach counter to his or her religious beliefs consistent with the First Amendment is hardly a frivolous claim. Fortunately for us—and unfortunately for Veitch—we need not decide this difficult question. We agree with the district court that Veitch may not raise this issue because his resignation was voluntary and because the Navy did not act unreasonably in refusing to permit Veitch to withdraw his resignation.

Veitch contends that we are obliged to consider his constitutional challenges because the Navy's alleged unlawful behavior coerced Veitch into offering his resignation; in other words, he alleges that he was constructively discharged. Veitch's pleadings never really indicate the source of his cause of action. At oral argument, Veitch's counsel asserted that his claim and request for injunctive relief—the reinstatement of his status—was based on the Constitution itself. The government did not object to appellant's imprecision in his pleadings, nor did it deny that a claim for constructive discharge could be brought against the government directly under the Constitution.[1] The government insisted instead that Veitch's resignation was wholly voluntary. In light of the parties' posture, we shall assume, *arguendo,* that if the government illegally coerced an officer to resign, a constructive discharge claim could be brought.[2] Although we have found no cases that explicitly discuss such a claim, there are, of course, quite a number of constructive discharge cases that arise in the Title VII context. *See generally Penn. State Police v. Suders*, 542 U.S. 129, 142-43 (2004). To be sure, Veitch does not purport to be raising a claim under Title VII, and although this Court has not squarely ruled on the question, we note that every circuit to address the issue has held Title VII inapplicable to uniformed members of the armed services. *See, e.g., Fisher v. Peters*, 249 F.3d 433, 438 (6th Cir. 2001); *Brown v. United States*, 227 F.3d 295, 298 (5th Cir. 2000); *Hodge v. Dalton*, 107 F.3d 705, 707-12 (9th Cir.

---

[1]Presumably the waiver of sovereign immunity for such a direct action against the Navy—as opposed to the individual defendants—would come from the Administrative Procedure Act, 5 U.S.C. § 702.

[2]The existence *vel non* of a cause of action is not a jurisdictional question, and therefore we may assume it without deciding. *Trudeau v. Fed'l Trade Comm'n*, 456 F.3d 178, 190-91 (D.C. Cir. 2006).

1997); *Randall v. United States*, 95 F.3d 339, 343 (4th Cir. 1994); *Doe v. Garrett*, 903 F.2d 1455, 1459 (11th Cir. 1990); *Roper v. Dep't of the Army*, 832 F.2d 247, 248 (2d Cir. 1987); *Johnson v. Alexander*, 572 F.2d 1219, 1223-24 (8th Cir. 1978); *see also Collins v. Sec'y of the Navy*, 814 F. Supp. 130, 131 (D.D.C. 1993).[3] Nevertheless, Title VII cases provide standards by which to judge constructive discharge claims, and the district court relied on them, in part, to determine that Veitch's resignation was voluntary. While a constitutional claim for constructive discharge might not track the standards used to decide Title VII cases, we think it likely that actions that did not amount to a constructive discharge under Title VII would not violate an employee's constitutional protections.

Veitch's constructive discharge claim rests on four elements. The first, and by far the most important according to appellant, is the Zoeller Report. Veitch focuses so heavily on the Report because it is the only document in this case that both defines the doctrine of pluralism and acknowledges that the Navy Chaplain Corps requires its chaplains to preach pluralistically. According to Veitch, the Zoeller Report's unconstitutional conclusions made his resignation the product of duress, which fact thus vitiates the voluntariness of his choice and entitles him to reinstatement. There are longstanding precedents in the Federal Circuit holding that resignations produced by unlawful government duress or coercion are invalid. *See, e.g.*, *Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2000). The test for duress is objective, and has three parts: Under a reasonable person standard, Veitch must show "(1) he involuntarily accepted the terms of the

---

[3]The Equal Employment Opportunity Commission agrees with the circuits that have decided this issue. *See* 29 C.F.R. § 1614.103(d)(1) (2006) (excluding uniformed members of the military departments from Title VII's anti-discrimination provisions).

government; (2) circumstances permitted no other alternative; (3) said circumstances were the result of the government's coercive acts." *Id.* Veitch's difficulty is that the Zoeller Report in no sense punished or threatened him; it simply rejected his EO Complaint against Buchmiller. That Zoeller's nonbinding legal conclusions were not "coercive acts" seems obvious.

Veitch's argument seems to be that if the Navy's actions against him—e.g., the dismissal of his EO Complaint—were unlawful, then they were *per se* coercive, whether or not those actions would actually force a reasonable person in Veitch's position to resign. For this extraordinary proposition, Veitch relies on one Court of Claims case, *Roskos v. United States*, 549 F.2d 1386 (Cl. Ct. 1977), in which the court said, "An action is not voluntary if it is *produced* by government action which is wrongful." *Id.* at 1389-90 (emphasis added). But in that case, the illegal act was the unauthorized transfer of the plaintiff to another city, which the court described as one that "[left] the employee with no practicable alternative [but to resign]." Thus, *Roskos*, far from announcing a new standard for challenges to government action, is entirely consistent with the Federal Circuit's tripartite duress test. The *Roskos* court simply found that "circumstances permitted no other alternative." *Carmichael*, 298 F.3d at 1372. It can hardly be claimed that the Zoeller Report left Veitch with no practical alternative but resignation. Indeed, Veitch could have appealed the results of Zoeller's investigation, but chose not to do so. Veitch thus had a "reasonable alternative" to resignation that negates the second duress requirement. *See Kim v. United States*, 47 Fed. Cl. 493, 497-98 (2000).

The second and third elements in Veitch's constructive discharge claim relate to the court-martial charges brought against him. It will be recalled that he was charged, *inter alia*, with disrespect to a superior officer under Article 89 of the

UCMJ.  Here Veitch raises a rather subtle argument, relying on a district court opinion in our circuit, *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997), for the proposition that military chaplains cannot be "superior commissioned officers" as that term is used in 10 U.S.C. § 889, and so the Article 89 charge against him was improper.  But *Rigdon* did not deal with actions alleged to be disrespectful to a superior officer, and whether or not it is a sound interpretation of the UCMJ, nothing prevented Veitch  from contesting his court-martial on that or any other ground.

A court-martialed serviceman or woman has a congressionally enacted process of military appeals by which to contest allegedly unlawful charges. And this process, notably, does not include immediate resort to the federal courts.  For instance, after a conviction, the accused has right to review of his or her sentence by the court-martial's convening authority, and, following that, by the Navy Judge Advocate General. *See generally* 10 U.S.C. §§ 859-67.  In certain circumstances—including those involving sentences of dismissal or discharge—a serviceman or woman has a right of appeal to the United States Navy-Marine Corps Court of Criminal Appeals, and, by petition, to the United States Court of Appeals for the Armed Forces.[4]  *Id.*  Congress thus carefully

---

[4]On all but rare occasions, the accused may obtain a writ of habeas corpus only *after* progressing through the appellate hierarchy of military courts. *See Schlesinger v. Councilman*, 420 U.S. 738, 758 (1975) ("[F]ederal courts normally will not entertain habeas petitions by military prisoners unless all available military remedies have been exhausted."). The one major exception to the general rule requiring exhaustion of military court remedies prior to obtaining habeas relief involves cases where military courts are claimed to lack jurisdiction over the accused.  In such cases, collateral attack is allowed prior to the conclusion of military court proceedings. *See id.* at 746-53.

designed a scheme of military appeals to prevent needless federal court review of military affairs. By resigning in the face of his court-martial charges, however, Veitch neglected to exhaust his military court remedies. *See Parisi v. Davidson*, 450 U.S. 34, 41-46 (1972) (recognizing the exhaustion requirement applied to courts-martial when the accused could gain complete relief before such tribunals). Veitch cannot now escape the consequences of that decision by characterizing the court-martial charges themselves as evidence of coercion. Successfully contesting the court-martial would have provided Veitch full relief from the allegedly unlawful charge under Article 89, and when full relief is available from a court-martial, civilian courts should require resort to that tribunal in the first instance.

Veitch also claims that his appointed counsel led him astray by not telling him about *Rigdon* and the possible defense to the court-martial that case provided. He relies chiefly on *Tippett v. United States*, 185 F.3d 1250 (Fed Cir. 1999), in which our neighbor court held that an Army captain's discharge was not voluntary if based on his Army lawyer's misrepresentation of his legal rights, *id.* at 1258. Veitch never fully develops his assertion that his Navy lawyer's failure to bring *Rigdon* to his attention was a causal factor in his decision to resign. In *Tippett*, it was essentially uncontested that the plaintiff had based his decision to resign on his military lawyer's advice as to the effect his resignation would have on his subsequent intent to apply for a reserve commission. On the record before us, there is nothing to support a conclusion that Veitch resigned because of his lawyer's failure to discover favorable legal precedent, which, in this case, amounted to a single district court decision that is not binding precedent for any other court. Such a conclusion is further undercut by the fact that Veitch's Navy lawyer had the case for two days prior to Veitch's resignation. Moreover, Veitch was charged not only with an Article 89 offense, but also

11

with an Article 86 violation (failure to appear at an appointed place of duty) and *Rigdon*, even if correctly decided (which we doubt), has no bearing on that charge.

Finally, Veitch asserts, relying on an analogy with Title VII cases holding that a hostile work environment can be the cause of a constructive discharge, that he faced just such a hostile environment at NSA Naples. As already noted, we assume, *arguendo*, that Veitch may raise a constructive discharge claim directly under the Constitution, but whether or not that is so, such a claim could not require *less* of a showing than would qualify under Title VII itself. The district court concluded that Veitch had not presented a triable issue of fact on the question of intolerable work conditions. On appeal, Veitch argues that the district court ignored evidence of a hostile work environment and failed to give Veitch the inferences to which he is entitled as the nonmoving party on a motion for summary judgment. We are by no means convinced that the district court erred in its evaluation of the evidence; however, we do not believe it necessary to resolve these questions because, viewing the record in the light most favorable to Veitch, his claims fail to make out a hostile work environment as a matter of law.

We have held that a plaintiff bringing an employment discrimination claim under Title VII on the theory of "constructive discharge" must show that the employer deliberately created intolerable work conditions that forced the plaintiff to quit. *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Suders*, 542 U.S. at 141 (citing C. Geoffrey Weirich et al., *2002 Cumulative Supplement to Lindemann & Grossman* 651-52 & n.1). We have stated before that the mere existence of workplace discrimination is insufficient to make out a

constructive discharge claim; "[c]onstructive discharge . . . requires a finding of discrimination *and* the existence of certain 'aggravating factors.'" *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark*, 665 F.2d at 1174) (emphasis added). "Aggravating factors" are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job. *Id.* (citing *Clark*, 665 F.2d at 1174).

The question before us is whether the record reveals any aggravating factors that could give rise to a constructive discharge. Veitch makes various claims of harassment and discrimination by Buchmiller: Buchmiller stated twice that Veitch would "not be doing much" in Naples; Buchmiller did not assign Veitch collateral duties during his first thirteen months in Italy; Buchmiller repeatedly criticized Veitch's sermons; Veitch was forced to share a cramped office with a junior chaplain; Buchmiller denied Veitch the role and responsibilities of senior Protestant chaplain; Buchmiller did not speak to Veitch during staff meetings; Buchmiller assigned Veitch to assist a junior chaplain in the Vacation Bible School; Buchmiller tore a Reformation Conference poster off Veitch's wall; Veitch was assigned to pastor the "Maranatha" worship service, to which Veitch's conservative liturgical tradition was inimical; Buchmiller spoke to Veitch in a "curt" manner. Veitch further argues that there was a general anti-evangelical environment at NSA Naples that contributed to the intolerable work conditions created by Buchmiller.

Accepting these assertions as true, we conclude that, as a matter of law, they do not constitute "aggravating factors" under our Title VII precedents. In the context of gender discrimination, the Supreme Court has stated that "to establish hostile work environment, plaintiffs . . . must show harassing

behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.'" *Suders*, 542 U.S. at 133 (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Surely the "severe and pervasive" requirement applies equally to the evaluation of "aggravating factors" in cases alleging religious discrimination. Here Veitch does not claim conduct sufficiently "severe and pervasive" to create an aggravated work environment in which an employee had no choice but to resign.

Most of Veitch's grievances—e.g., nonselection as senior protestant chaplain, assignment to the "Maranatha" worship service, assignment to work with a junior chaplain, lack of collateral duties, sharing a small office with another chaplain, criticism from Buchmiller—have explicitly been rejected as "aggravating factors." *See* Weirich et al*., supra,* at 663-64 ("Generally, a failure to promote will not constitute constructive discharge, nor will a change in job duties, a transfer, . . . criticism, pressure from a supervisor, or being ignored by co-workers.") (citations omitted). Veitch's remaining complaint is that Buchmiller tore down his Reformation Conference poster. Such an act, while possibly boorish and unjustified, hardly constitutes the type of harassing behavior that would give rise to a constructive discharge. All of these assertions, if true, may have made Veitch's experience at NSA Naples somewhat frustrating. But they cannot be considered sufficiently "severe" to leave a reasonable employee with no realistic option but to quit his or her job. *Compare, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 528-29 (D.C. Cir. 2003) (remanding to the district court for a finding on the question of hostile work environment when the plaintiff had been forced to work in an unheated, unventilated storage room containing brooms and boxes of debris when more suitable office space was available).

III

Once determining that appellant had voluntarily resigned—a determination we affirm—the district court, following our opinion in *Taylor v. FDIC*, 132 F.3d 753 (D.C. Cir. 1997), held that Veitch lacked standing to pursue his broadside constitutional attack on the Navy Chaplain Corps's pluralism policy. We quite agree with the district court on the assumption that the resignation stands. But appellant also claims that the Navy acted arbitrarily and capriciously in denying his request to withdraw his resignation, an added claim not present in *Taylor*. Veitch argues that the Navy erred by relying on the NIG's conclusions with respect to the Zoeller Report.[5] Although Veitch does not specify, we assume—and the government apparently concedes—that review of the Navy's decision is premised on the Administrative Procedure Act ("APA"). 5 U.S.C. § 704.

There is no doubt that appellant has standing to raise his APA claim even though, as we conclude, his resignation was voluntary. After all, the Secretary of the Navy himself suspended Veitch's resignation order until the completion of the NIG investigation, which suggests that even if his resignation had been legally voluntary, the Navy would have permitted him to withdraw it if the NIG investigation had shown his supervisors acted with retaliatory motive. Thus, favorable review of the Navy's decision could potentially remedy Veitch's injury. Still, appellant's standing to raise this claim avails him little, for we have no grounds to conclude that the Navy acted unreasonably in refusing his withdrawal request.

---

[5]As part of the NIG inquiry into collateral issues surrounding Veitch's complaint under the Military Whistleblower Protection Statute, 10 U.S.C. § 1034, the DoDIG instructed the NIG to investigate Veitch's original EO Complaint and Zoeller's findings.

Veitch argues that the Zoeller Report infected the Navy's decisionmaking process from start to finish. If the Zoeller Report contained unconstitutional statements about pluralism, then, according to Veitch, it could not serve as a valid basis for the Navy's decision to deny his withdrawal request. But this argument ignores the Navy's entirely independent ground for denying Veitch's request, namely, the finding of no retaliation. The NIG reported that Coyne, Buchmiller, and Gray's actions did not violate the Whistleblower Protection Statute, meaning that Veitch could not point the finger at his commanding officers to explain his disciplinary problems. Thus even if Zoeller's conclusions had been palpably unconstitutional, the fact that there was no retaliation for the EO Complaint means that Veitch's request would still have been denied because his disciplinary troubles were the result of his own misconduct. Veitch offers no reason for us to doubt the verity of the NIG's conclusion about retaliation, let alone disturb such a finding under our limited scope of review. The deference we owe an agency decision under the arbitrary and capricious test precludes our reweighing the factors leading the Navy to deny his request.

IV

Based on the foregoing, we affirm summary judgment as to all claims.

ROGERS, *Circuit Judge*, concurring: The Navy has never challenged Rev. D. Philip Veitch's lawsuit on the ground that he states no cause of action for constructive discharge. As the court acknowledges, Op. at 6 n.2, the existence of a cause of action in a complaint is not jurisdictional and may be assumed without being decided by the court. *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 523 n.3 (1991) (citing *Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979)). Although courts enjoy discretion to consider non-jurisdictional issues raised for the first time on appeal, *Acree v. Republic of Iraq*, 370 F.3d 41, 58 (D.C. Cir. 2004), no "extraordinary circumstances" exist here as would warrant the court's consideration of the issue. *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992). The Navy has never argued in the district court or this court that Rev. Veitch has failed to state a cause of action for constructive discharge. Consequently, the issue has not been briefed by the parties on appeal. Further, during oral argument, when the court raised the issue, counsel for the Navy did not adopt the position that there was no such cause of action.

Because, regardless of the cause of action, the evidence shows that Rev. Veitch voluntarily resigned from the Navy, he lacks standing to bring, and the court lacks jurisdiction to consider, his claim for reinstatement or his equitable claims regarding the conditions of his former employment. *See Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 766-68 (D.C. Cir. 1997). Consequently, the court has no occasion to consider the nature of the evidentiary burden, Op. at 6-7, nor whether Rev. Veitch met that evidentiary burden in opposing the Navy's motion for summary judgment to show that the Navy's "pluralism" policy[1] violated his rights under the First and Fifth

---

[1] The Navy's pluralism policy is discussed in the Zoeller Report, *see* Op. at 3, wherein Chaplain Gary Morris, of the United Methodist faith, reported that chaplain trainees "are taught that

Amendments; the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb; or Navy regulations.

The Navy rightly points out that if Rev. Veitch cannot prove that he was constructively discharged from the Navy, all of his remaining claims, which concern the conditions of his former employment as chaplain and for which he seeks only injunctive and declaratory relief, fail for lack of Article III standing. The Supreme Court has instructed that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)) (omission and alteration in original, internal quotation marks omitted). If Rev. Veitch's resignation from the Navy was voluntary, then he has no legal right to reinstatement to his position as a Navy chaplain, and the court cannot grant him the declaratory and injunctive relief he seeks regarding the conditions of his prior employment. This court stated in *Bois v. Marsh*, 801 F.2d 462, 466 (D.C. Cir. 1986), that a plaintiff who has voluntarily resigned from the armed forces "stands in the civil courts as a civilian seeking reform of military procedures to which she is no longer subject." To bring this appeal claiming First and Fifth Amendment and statutory violations, therefore, Rev. Veitch must be able to show that his resignation is traceable to the Navy, specifically, on his terms, that he was coerced as a result of retaliation by the Navy for protesting the alleged religious discrimination and statutory violations he suffered. In other words, Rev. Veitch must prove constructive discharge.

---

facilitating other religions and ministries is essential," along with "respect for other differences and traditions of faith especially when [a Navy] chaplain might have a mixed [faith] congregation." Joint Appendix at 649.

This court has declared:

> "[A] constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign." It does not occur when an employee leaves an unpleasant but objectively tolerable job because alternatives have become more attractive, even if the employer's misbehavior creates the unpleasantness . . . .

*Taylor*, 132 F.3d at 766 (quoting *Katradis v. Dav-El of Wash.*, 846 F.2d 1482, 1485 (D.C. Cir. 1988)) (alteration in original). The question, then, is whether Rev. Veitch has presented evidence from which a reasonable jury could conclude that his resignation was forced by the Navy. Although he is entitled as the non-moving party to the benefit of all reasonable inferences, he cannot rely in opposing summary judgment on mere allegations in his unsworn complaint, much less on assertions made in his brief on appeal; the court may consider only sworn statements setting forth specific facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988); FED. R. CIV. P. 56(e).

In *Taylor*, the court considered what constructive discharge requires. The plaintiffs in that case were former employees of the Resolution Trust Corporation ("RTC") who alleged that RTC's successor corporation, the Federal Deposit Insurance Corporation, retaliated against them for making protected disclosures in violation of the RTC Whistleblower Act, 12 U.S.C. § 1441a(q), and the First Amendment. 132 F.3d at 758-59. The court noted that the plaintiffs endured whatever the defendant inflicted upon them until May 1995, when they took advantage of the severance package offered by the Voluntary Separation Incentive Program. The plaintiffs did not suggest

that any simultaneous increase in the "wattage of harassment" drove them out. *Id.* at 766. While the court noted that what would drive a reasonable person to resign "may vary with the character of the job for which the employee was hired and thus, indirectly, with the employee's skills," it held that the plaintiffs had presented no triable issue of fact on the question of constructive discharge. *Id.* The court vacated the grant of summary judgment and remanded the case for the district court to dismiss the complaint.

Rev. Veitch similarly claims that his resignation was forced because of past discrimination—which he tolerated while engaging in an exchange of emails with Captain Buchmiller, filing an Equal Opportunity complaint, and considering filing another complaint. Ultimately, however, Rev. Veitch resigned rather than face disciplinary proceedings for his disrespectful emails and unexplained absences. This does not render his resignation involuntary. *See Pitt v. United States*, 420 F.2d 1028, 1032-33 (Ct. Cl. 1970); *Kim v. United States*, 47 Fed. Cl. 493, 497-98 (2000). Rev. Veitch presents no evidence to suggest that past discrimination required him to be disrespectful in violation of the Uniform Code of Military Justice as alleged, or, shy of that, that the Captain's Mast or court-martial proceedings would have been so unfair so as to force his resignation. To the contrary, the claims he raises here could have been raised before a Navy tribunal. Op. at 10.

Other courts have agreed that the standard for constructive discharge is quite high. "Resignations or retirements are presumed to be voluntary," *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed. Cir. 1999), and a party alleging that a facially valid resignation was in fact the product of unlawful duress must prove three elements: (1) one side involuntarily accepted the terms of another; (2) the circumstances permitted no other alternative; and (3) the circumstances were the result of coercive

acts of the opposite party, *Roskos v. United States*, 549 F.2d 1386, 1389 n.11 (Ct. Cl. 1977); *see also Kim*, 47 Fed. Cl. at 497. Under the standard for summary judgment, Rev. Veitch cannot succeed in showing here that the circumstances permitted no option except resignation from the Navy.

Alternatively, Rev. Veitch contends that the voluntariness of his resignation was vitiated by his attorney's failure to inform him of *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997). This argument strains credulity, for the district court opinion is binding neither on the Navy's understanding of Article 89 of the Code of Military Justice nor on this court.

Article III standing requires the plaintiff to show that his injury is "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984). As the court reasoned in *Taylor*:

> Our rejection of [the plaintiffs'] claim of constructive discharge is concomitantly a decision that their voluntary acts are sufficient independent causes of their separation from the RTC.
>
> This is quite consistent with [the plaintiffs'] (theoretically) having a claim against the RTC for its earlier mistreatment. . . . Had [the plaintiffs] remained [employed at the RTC], they might have been entitled to some sort of restoration of their earlier status; having left under circumstances for which the RTC is not legally culpable, however, they cannot claim that the RTC has deprived them of their jobs, even if its prior treatment of them, though falling short of constructive discharge, was actionable. Failing to show causation, they lack standing.

132 F.3d at 767. Had Rev. Veitch pressed his broad attack against the Navy's "pluralism" policy only on constitutional and statutory grounds, the court would lack jurisdiction to hear the case altogether. However, Rev. Veitch also contends that the Navy acted arbitrarily and capriciously in denying his request to withdraw his resignation. Although he has standing to raise this claim, it fails on the merits, *see* Op. at 14-15.

Accordingly, because Rev. Veitch failed to present evidence establishing a material issue of disputed fact as to whether he was constructively discharged from the Navy, nor met his burden to show that the Navy acted unreasonably in denying his request to withdraw his resignation, I concur in affirming the grant of summary judgment to the Navy.